**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

**TERRY JONES**                                          **CIVIL ACTION**

**VERSUS**                                               **NO. 07-3816**

**BURL CAIN, WARDEN**                                    **SECTION "N"(4)**

## REPORT AND RECOMMENDATION

This matter was referred to a United States Magistrate Judge to conduct hearings, including an evidentiary hearing if necessary, and to submit proposed findings and recommendations pursuant to **28 U.S.C. § 636(b)(1)(B) and (C)**, and as applicable, **Rule 8(b) of the Rules Governing Section 2254 Cases**. Upon review of the entire record, the Court has determined that this matter can be disposed of without an evidentiary hearing. *See* 28 U.S.C. § 2254(e)(2).[1]

## I.     Factual and Procedural Background

The petitioner, Terry Jones ("Jones"), is a convicted inmate presently incarcerated in the Louisiana State Penitentiary in Angola, Louisiana.[2] On October 5, 1995, Jones and his brother, Gary

---

[1]Under 28 U.S.C. § 2254(e)(2), an evidentiary hearing is held only when the petitioner shows that either the claim relies on a new, retroactive rule of constitutional law that was previously unavailable or a factual basis that could not have been previously discovered by exercise of due diligence and the facts underlying the claim show by clear and convincing evidence that, but for the constitutional error, no reasonable jury would have convicted the petitioner.

[2]Rec. Doc. No. 1.

Jones, were indicted by a grand jury in Orleans Parish for the second degree murder of Darnell Andrews.[3]

The record reflects that, on May 26, 1995, Andrews was found dead in the Lafitte Housing Project of a single gunshot wound that entered his left arm, went into and across his chest, then exited and went through his right arm. The bullet pierced his left lung, part of his heart, the pulmonary artery, and his right lung.[4] Andrews's brother, Bruce Nelson, gave the police the names of the two men, Gary and Terry Jones, whom he thought were responsible for shooting his brother. Nelson had seen his brother around 9:30 p.m. that night and learned that Andrews was fighting with Gary and Terry Jones. He saw the Joneses later and they were carrying guns. When they met up with Andrews, both brothers shot at Andrews, who was not hurt at that time. When Nelson went back to check on his brother later, he found him lying on the ground next to his bicycle.

The two men, Terry and Gary Jones, were eventually arrested. A .38 caliber Lorcin[5] handgun was found in the car from which Gary Jones had just exited. Terry Jones told police that his brother, Gary, had an argument with Andrews, who pulled out a gun. He pointed the gun at Gary, pulled the trigger, and the gun misfired. Andrews rode away on a bicycle. He later returned and fired more shots in the area and left again. Terry and Gary obtained .38 caliber or nine millimeter handguns, looked for Andrews, and fired some shots at him when they found him.

In a recorded statement, Gary Jones told the police that after their argument, Andrews pointed a gun at him and it did not go off. He came back later and pointed the gun at him, but it

---

[3]St. Rec. Vol. 4 of 4, Indictment, 10/5/95; Grand Jury Return, 10/4/95.

[4]These facts were taken from the unpublished opinion of the Louisiana Fourth Circuit Court of Appeal on direct appeal. *State v. Jones*, 771 So.2d 328 (La. App. 4th Cir. 2000) (Table); St. Rec. Vol. 2 of 4, 4th Cir. Opinion, 99-KA-1123, pp. 1-5, 9/20/00.

[5]The opinion improperly refers to this as a "Larson" handgun.

again failed to fire. He and Terry met with someone named Theron, from whom they got two guns, which were either .38 caliber or nine millimeter semi-automatic guns. The two brothers went looking for Andrews. When they found him, they exchanged fire with Andrews in the Prieur Court of the housing project. Gary and Terry ran back to the Galvez Court where they stayed for about 45 minutes. They were in the Johnson Court when Andrews shot at them again. Gary chased Andrews and shot him. Gary and Terry ran back to the Galvez Court and returned the guns to Theron. He also told police that their brother Kerry, Terry's twin, was not involved.

Brenda Banks also saw Gary Jones shooting at Andrews in the Lafitte Housing Project. She later saw the Jones brothers holding guns as they walked down the street towards Derbigny Street and Orleans Avenue. She saw them push Andrews off of his bicycle, and she heard Andrews ask them not to shoot him. She heard two shots, and after the first shot, she hid in the bushes. On July 14, 1995, Banks picked Gary Jones's picture out of a photographic line-up. At another photographic line-up on August 3, 1995, she also identified Terry Jones and his twin brother Kerry Jones. She was unable to distinguish between the two, but she was certain that one of them participated in the shooting.

Prior to trial and after hearings held on October 27, 1997, January 13, 1998, April 17, 1998, and April 21, 1998, the Trial Court denied defense counsel's motions to suppress the inculpatory statements and the photographic line-ups.[6] Thereafter, Terry and Gary Jones were jointly tried

---

[6]St. Rec. Vol. 4 of 4, Motion to Suppress the Confession, 12/4/95; Motion to Suppress the Identification, 12/4/95; Hearing Minutes, 4/21/98; Hearing Minutes, 4/17/98; Hearing Minutes, 1/13/98; Hearing Minutes, 10/27/97; St. Rec. Vol. 2 of 4, Trial Transcript, pp. 19-26, 4/21/98; St. Rec. Vol. 1 of 4, Hearing Transcript, 4/17/98; Hearing Transcript, 1/13/98; Hearing Transcript, 10/27/98.

before a jury on April 21 and 22, 1998, and they each were found guilty as charged.[7]  The Trial Court sentenced both men on June 5, 1998, each to serve the mandatory life sentence without benefit of parole, probation, or suspension of sentence.[8]

On April 22, 1999, the Trial Court granted Terry Jones an out of time appeal.[9]  On direct appeal to the Louisiana Fourth Circuit Court of Appeal, which was considered jointly with that of Gary Jones, Terry's appointed counsel argued that the sentence was unconstitutionally excessive.[10] Jones filed *pro se* a supplemental brief raising six assignments of error:[11] (1) the Trial Court erred by individually denying the motion to suppress the identifications by Banks; (2) Jones was denied effective assistance of counsel on appeal because the record contains inconsistent statements by the trial witnesses; (3) the evidence was insufficient to support the verdict because Banks could not positively identify the shooter; (4) the Trial Court erred in instructing the jury on principals; (5) the Trial Court erred in admitting Gary Jones's confession; and (6) Jones was denied effective assistance of counsel on appeal because counsel only raised excessive sentence.

On September 20, 2000, the Louisiana Fourth Circuit Court of Appeal affirmed Terry Jones's conviction and sentence.[12]  With respect to Terry Jones, the Court held that his claims regarding the jury instruction on principals and the admission of Gary's confession were procedurally barred from

---

[7]St. Rec. Vol. 4 of 4, Trial Minutes (2 pages), 4/21/98; Trial Minutes (2 pages), 4/22/98; Jury Verdict (Terry Jones), 4/22/98; Jury Verdict (Gary Jones), 4/22/98; St. Rec. Vol. 2 of 4, Trial Transcript, 4/21/98; Trial Transcript, 4/22/98.

[8]St. Rec. Vol. 4 of 4, Sentencing Minutes, 6/5/98; Minute Entry, 7/31/98; St. Rec. Vol. 1 of 4, Sentencing Transcript, 6/5/98.

[9]St. Rec. Vol. 4 of 4, Motion to Out of Time Appeal, 4/22/99; Trial Court Order, 4/22/99.

[10]St. Rec. Vol. 2 of 4, Appeal Brief, 99-KA-1123, 1/18/00.

[11]St. Rec. Vol. 2 of 4, Supplemental Appeal Brief, 99-KA-1123, 4/17/00.

[12]Gary Jones's conviction and sentence as also affirmed.

review for lack of contemporaneous or prior objection pursuant to La. Code Crim. P. art. 841[13] and La. Code Crim. P. arts. 801[14] and 841, respectively.[15]  The Court also denied relief on the remaining claims raised by Terry Jones and his counsel as meritless.  The Court later refused Jones's *pro se* application for rehearing on November 15, 2000.[16]

Jones's subsequent writ application to the Louisiana Supreme Court was denied without reasons on November 16, 2001.[17]  The Court also denied Jones's request for reconsideration on March 8, 2002.[18]  Terry Jones's conviction became final 90 days later, on June 2, 2002.  *Ott v. Johnson*, 192 F.3d 510, 513 (5th Cir. 1999)(period for filing for certiorari with the United States Supreme Court is considered in the finality determination under 28 U.S.C. § 2244(d)(1)(A); U.S. S.Ct. Rule 13(1).

On January 23, 2002, Jones mailed an application for post-conviction relief to the Trial Court raising 10 grounds for relief:[19] (1) ineffective assistance of counsel for failure to request a severance;

---

[13]At the time, Article 841 provided in relevant part that "[a]n irregularity or error in the proceedings cannot be availed of after verdict unless it is objected to at the time of its occurrence and a bill of exceptions is reserved to the adverse ruling of the court on such objection."

[14]Article 801 provided at the time that "a party may not assign as error the giving or failure to give a jury charge or any portion thereof unless an objection thereto is made before the jury retires or within such time as the court may reasonably cure the alleged error."

[15]*State v. Jones*, 771 So.2d 328 (La. App. 4th Cir. 2000) (Table); St. Rec. Vol. 2 of 4, 4th Cir. Opinion, 99-KA-1123, pp. 1-5, 9/20/00.

[16]St. Rec. Vol. 2 of 4, Application for Rehearing, 11/3/00; St. Rec. Vol. 2 of 4, 4th Cir. Opinion, 99-KA-1123, p. 13, 9/20/00 (refused 11/15/00).

[17]*State v. Jones*, 802 So.2d 620 (La. 2001); St. Rec. Vol. 2 of 4, La. S. Ct. Order, 2000-KO-3486, 11/16/01; La. S. Ct. Letter, 2000-KO-3486, 12/21/00.  Although the State indicated in its memorandum that it would forward a copy of this writ application to the Court, it failed to do so.

[18]*State v. Jones*, 810 So.2d 1152 (La. 2002); St. Rec. Vol. 4 of 4, La. S. Ct. Order, 2000-KO-3486, 3/8/02.

[19]*See* St. Rec. Vol. 3 of 4, Copy of Application for Post-Conviction Relief, dated 1/22/03; Mail Receipt, 1/23/03.

(2) the State withheld favorable *Brady*/*Kyles* evidence[20] regarding Brenda Banks; (3) ineffective assistance of counsel for failure to effectively impeach Bruce Nelson; (4) the Trial Court gave an erroneous jury instruction on reasonable doubt, and counsel was ineffective for failure to object to the charge; (5) ineffective assistance of counsel for failure to pursue medical records on Brenda Banks to discredit her testimony; (6) the photographic identification was suggestive and counsel was ineffective for failure to argue that it was; (7) ineffective assistance of counsel for failure to object to the State's use of impermissible demonstrative evidence, i.e. the gun; (8) ineffective assistance of counsel for failure to call witnesses or perform pretrial investigation; (9) the Trial Court erred in its jury instruction on evidence thereby denying him the right to present a defense by way of the witnesses demeanor; and (10) the Trial Court lacked subject matter jurisdiction because of racial discrimination in the selection of grand jury forepersons under La. Code Crim. P. art. 413(c), and counsel was ineffective for failure to move to quash the indictment.

Thereafter, on February 10, 2003, Jones submitted a request to supplement his claims with two additional grounds for relief:[21] (11) ineffective assistance of counsel for failure to impeach and cross-examine Banks on her inconsistent statements to police; and (12) ineffective assistance of counsel for allowing the State to admit Gary Jones's statement at trial. Although the state court record does not contain file-stamped copies of the application or the supplemental application, the State does not contest that they were submitted to the Trial Court.[22]

---

[20]This appears to be a reference to *Brady v. Maryland*, 373 U.S. 83, 87 (1963) and *Kyles v. Whitley*, 514 U.S. 419 (1995).

[21]*See* St. Rec. Vol. 3 of 4, Pro Se Motion to File Supplemental Memorandum, dated 2/9/03; Mail Receipt, 2/10/03.

[22]*See* Rec. Doc. No. 14, p.1.

Over three years later, on August 4, 2006, Jones submitted an application for writ of mandamus to the Louisiana Fourth Circuit. He alleged therein that he had not received a ruling from the Trial Court on his post-conviction application.[23] On August 29, 2006, the Court, after review of Jones's claims, found that he was not entitled to relief.[24] The Louisiana Supreme Court, on June 22, 2007, also denied Jones's related writ application to that Court without stated reasons.[25]

## II.   Federal Petition

On July 23, 2007, the Clerk of Court filed Jones's petition for federal habeas corpus relief, in which he raised 15 claims:[26]

   (1)   the Trial Court erred in imposing an excessive sentence;

   (2)   the Trial Court erred in giving an improper jury instruction on principals;

   (3)   the Trial Court erred in admitting Gary Jones's confession;

   (4)   he received ineffective assistance of counsel on appeal;

   (5)   ineffective assistance of counsel for failure to request a severance;

   (6)   (a) the State withheld favorable *Brady*/*Kyles* evidence regarding Brenda Banks's statement, and (b) counsel was ineffective for failure to impeach or cross-examine Banks concerning her inconsistent statements;

   (7)   ineffective assistance of counsel for failure to impeach Bruce Nelson;

   (8)   (a) the Trial Court erred in giving an erroneous jury instruction on reasonable doubt, and (b) counsel was ineffective for failure to object to the charge;

---

[23]St. Rec. Vol. 3 of 4, 4th Cir. Writ Application, 2006-K-1063, 8/10/06 (dated 8/4/06).

[24]St. Rec. Vol. 3 of 4, 4th Cir. Order, 2006-K-1063, 8/29/06.

[25]*State ex rel. Jones v. State*, 959 So.2d 493 (La. 2007); St. Rec. Vol. 3 of 4, La. S. Ct. Order, 2006-KH-2465, 6/22/07; La. S. Ct. Writ Application, 06-KH-3465, 10/16/06 (postmarked 9/26/06, signature dated 9/21/06).

[26]Rec. Doc. No. 1.

(9)     ineffective assistance of counsel for failure to pursue the medical records of Brenda Banks;

(10)    (a) the photographic line-up was suggestive, and (b) counsel was ineffective for failure to argue this ground;

(11)    ineffective assistance of counsel for failure to object to the State's use of impermissible demonstrative evidence, i.e. the gun;

(12)    ineffective assistance of counsel for failure to call witnesses and conduct a pretrial investigation;

(13)    the Trial Court gave an erroneous jury instruction on evidence which prevented him from presenting a defense based on the witnesses' demeanor;

(14)    (a) the Trial Court lacked subject matter jurisdiction because of racial discrimination in the grand jury foreperson selection process under La. Code Crim. P. art. 413(C), and (b) counsel was ineffective for failure to move to quash the indictment; and

(15)    ineffective assistance of counsel for failure to object to the joint trial.

The State filed a response in opposition to Jones's petition arguing that his second and third claims are procedurally barred from review and the remaining claims are without merit.[27] Jones filed a response to the State's opposition requesting the Court to consider the merits of his claims.[28]

III.    **General Standards of Review**

---

[27]Rec. Doc. No. 14.

[28]Rec. Doc. No. 15.

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214,[29] applies to this petition, which is deemed filed in this court under the federal mailbox rule on July 2, 2007.[30]  The threshold questions in habeas review under the amended statute are whether the petition is timely and whether the claim raised by the petitioner was adjudicated on the merits in state court; *i.e.*, the petitioner must have exhausted state court remedies and must not be in "procedural default" on a claim.  *Nobles v. Johnson*, 127 F.3d 409, 419-20 (5th Cir. 1997) (citing 28 U.S.C. § 2254(b), (c)).

The State concedes exhaustion of the claims and the timeliness of the petition in its opposition response.  The State, however, raised the procedural default of Jones's claims challenging jury charge on principals and the admission of Gary Jones's confession.  The Court first will address the procedural default defense before proceeding to the merits of the remaining claims.

## IV.    Procedural Default (Claims 2 and 3)

The record demonstrates that Jones's second and third claims, challenging the principal jury trial and the use of Gary's confession, were not addressed on the merits by the Louisiana Fourth Circuit.  Instead, the Court found that Jones waived any objection he had to that jury charge and the

---

[29]The AEDPA comprehensively revised federal habeas corpus legislation, including 28 U.S.C. § 2254, and applied to habeas petitions filed after its effective date, April 24, 1996.  *Flanagan v. Johnson*, 154 F.3d 196, 198 (5th Cir. 1998) (citing *Lindh v. Murphy*, 521 U.S. 320 (1997)).  The AEDPA, signed into law on that date, does not specify an effective date for its non-capital habeas corpus amendments.  Absent legislative intent to the contrary, statutes become effective at the moment they are signed into law.  *United States v. Sherrod*, 964 F.2d 1501, 1505 n. 11 (5th Cir. 1992).

[30]The Fifth Circuit has recognized that a "mailbox rule" applies to pleadings, including habeas corpus petitions filed after the effective date of the AEDPA, submitted to federal courts by prisoners acting pro se.  Under this rule, the date when prison officials receive the pleading from the inmate for delivery to the court is considered the time of filing for limitations purposes.  *Coleman v. Johnson*, 184 F.3d 398, 401 (5th Cir. 1999); *Spotville v. Cain*, 149 F.3d 374, 378 (5th Cir. 1998); *Cooper v. Brookshire*, 70 F.3d 377, 379 (5th Cir. 1995).  The clerk of court filed Jones's federal habeas petition on July 23, 2007, when the filing fee was paid.  Jones dated his signature on the petition as July 2, 2007.  This is presumed to be the earliest date on which he could have delivered it to prison officials for mailing.  The fact that he paid the filing fee on a later date does not alter the application of the federal mailbox rule to his petition.  *See Cousin v. Lensing*, 310 F.3d 843, 847 (5th Cir. 2002) (mailbox rule applies even if inmate has not paid the filing fee at the time of mailing) (citing *Spotville*, 149 F.3d at 374).

confession, because he did not timely or properly raise an objection in the trial court under La. Code Crim. P. arts. 801 and/or 841. The State raises this procedural default in its response to Jones's petition.

On direct appeal, Jones argued that the Trial Court's jury instruction on principals was erroneous. The Louisiana Fourth Circuit held that Jones waived the objection to the charge, because he did not timely or properly raise an objection at trial as required under La. Code Crim. P. arts. 801 and 841. The Court also barred review of Jones's claim that the Trial Court erred in allowing the State to use Gary's confession at the joint trial. The Court held that Jones waived any objection to the confession, because its admissibility was not challenged at trial.

Jones's subsequent writ application to the Louisiana Supreme Court was denied without written reasons. Therefore, the denial of relief on these claims by the higher court is presumed to be based on the same reasons set forth by the Louisiana Fourth Circuit. *Ylst v. Nunnemaker*, 501 U.S. 797, 802 (1991) (when the last state court judgment does not indicate whether it is based on procedural default or the merits of a federal claim, the federal court will presume that the state court has relied upon the same grounds as the last reasoned state court opinion).

The denial of relief on Jones's claims was based on state procedural grounds and his procedural default under the state procedural rules relied on by the state court. Generally, a federal court will not review a question of federal law decided by a state court if the decision of that state court rests on a state law ground that is both independent of the merits of the federal claim and adequate to support that judgment. *Coleman v. Thompson*, 501 U.S. 722, 731-32 (1991); *Glover v. Cain*, 128 F.3d 900, 902 (5th Cir. 1997), *cert. denied*, 523 U.S. 1125 (1998); *Amos v. Scott*, 61 F.3d 333, 338 (5th Cir. 1995) (citing *Harris v. Reed*, 489 U.S. 255, 260, 262 (1989)). The "independent

and adequate state law" doctrine applies to both substantive and procedural grounds and affects federal review of claims that are raised on either direct or post-conviction review. *Coleman*, 501 U.S. at 731-32. This type of procedural default will bar federal court review of a federal claim raised in a habeas petition when the last state court to render a judgment in the case has clearly and expressly indicated that its judgment is independent of federal law and rests on a state procedural bar. *Harris*, 489 U.S. at 263; *Glover*, 128 F.3d at 902.

## A. Independent State Grounds

For the foregoing state-imposed procedural bar to prevent review by this federal habeas court, the bar must be independent and adequate. A procedural restriction is "independent" if the state court's judgment "clearly and expressly" indicates that it is independent of federal law and rests solely on a state procedural bar. *Amos*, 61 F.3d at 338. To be "adequate," the state procedural rule must be strictly or regularly followed and evenhandedly applied to the majority of similar cases. *Glover*, 128 F.3d at 902.

In this case, the state courts held that Jones's challenge to the principal jury charge was not preserved by contemporaneous objection under La. Code Crim. P. arts. 801 and 841. The basis for the state courts' dismissal of this claim was therefore independent of federal law and relied strictly on state procedural requirements. *Harris*, 489 U.S. at 263; *Glover*, 128 F.3d at 902.

## B. Adequate State Grounds

The question of the adequacy of a state procedural bar is itself a federal question. *Douglas v. Alabama*, 380 U.S. 415, 422 (1965); *Jenkins v. Gramley*, 8 F.3d 505, 507 (7th Cir. 1993). To be "adequate," the state procedural rule must be strictly or regularly followed and evenhandedly applied to the majority of similar cases. *Glover*, 128 F.3d at 902 (citing *Amos*, 61 F.3d at 339). A state

procedural bar is presumptively adequate when the state court expressly relies on it in deciding not to review a claim for collateral relief. *Id.*

In evaluating the adequacy of the rules applied to bar a petitioner's claim, a federal habeas court does not sit to correct errors made by state courts in interpreting and applying state law. *Narvaiz v. Johnson*, 134 F.3d 688, 695 (5th Cir. 1998) (quoting *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990); and citing *West v. Johnson*, 92 F.3d 1385, 1404 (5th Cir. 1996)); *accord Turner v. Johnson*, 46 F. Supp. 2d 655, 674 (S.D. Tex. 1999). Rather, a federal court's analysis focuses on due process considerations, and due process requires only that the Court grant the writ when the errors of the state court make the underlying proceeding fundamentally unfair. *Neyland v. Blackburn*, 785 F.2d 1283, 1293 (5th Cir. 1986) (citing *McAffee v. Procunier*, 761 F.2d 1124, 1126 (5th Cir. 1985); *Lane v. Jones*, 626 F.2d 1296 (5th Cir. 1980)).

In keeping with this rule, a state procedural rule that is applied arbitrarily or in an unexpected manner may be considered inadequate to prevent federal review. *Martin v. Maxey*, 98 F.3d 844, 847 (5th Cir. 1996); *Prihoda v. McCaughtry*, 910 F.2d 1379, 1383 (7th Cir. 1990). A federal court may not second-guess a state court's rule of procedure, but must evaluate whether the rule was actually applicable on the particular facts of the case. Otherwise, state courts could disregard federal rights with impunity simply by using the word "waived." *United States ex rel. Bradley v. Clark*, No. 99-C-1785, 2002 WL 31133094 at *4 n.2 (N.D. Ill. July 18, 2002)(Gottschall, J.). For this reason, when state courts apply a procedural bar that has no foundation in the record or basis in state law, the federal courts need not honor that bar. *Davis v. Johnson*, No. 00-CV-684-Y, 2001 WL 611164 at *4 n.10 (N.D. Tex. May 30, 2001)(Means, J.); *see also*, *Johnson v. Lensing*, No. 99-0005, 1999 WL 562728 at *4 (E.D. La. July 28, 1999) (Berrigan, J.) (Art. 930.8 bar was not adequate because it was

not properly applied under the circumstances of the case); *Poree v. Cain*, No. 97-1546, 1999 WL 518843 at *4 (E.D. La. July 20, 1999) (Mentz, J.) (Art. 930.8 was not adequate to bar review because it was misapplied). However, where such a basis exists in state law, the bar must stand.

Article 801 of the Louisiana Code of Criminal Procedure prohibits a state criminal defendant from challenging a jury charge on appeal unless an objection was made "before the jury retires or within such time as the court may reasonably cure the alleged error." Article 841, also relied upon by the state courts, also prevents the bringing of a claim after the verdict where no contemporaneous objection was made during the underlying proceedings. As noted above, the Louisiana Fourth Circuit barred review of Jones's jury charge claim under La. Code Crim. P. art. 801, because he did not object to the charge in the trial court prior to the jury's deliberations. The Louisiana Fourth Circuit also relied upon La. Code Crim. P. art. 841 to bar review of both claims, because no objection was made to the charge or to the use of the confession prior to the verdict.

The federal courts have held that the failure to preserve a claim under La. Code Crim. P. art. 801 is an adequate state grounds which bars review by the federal courts in a habeas corpus proceeding. *See Duncan v. Cain*, 278 F.3d 537 (5th Cir. 2002); *Toney v. Cain*, 24 F.3d 240, 1994 WL 243453, at *2 (5th Cir. May 20, 1994) (Table, Text in Westlaw); *Bowie v. Cain*, 33 Fed. Appx. 705, 2002 WL 432675, at *3 (5th Cir. Mar. 27, 2002); *Perez v. Cain*, No. 04-1905, 2008 WL 108661, at **16-17 (E.D. La. Jan. 8, 2008) (Berrigan, J.). The same is true for the prohibition imposed by the contemporaneous objection rule under La. Code Crim. P. art. 841. *Toney*, 1994 WL 243453, at *2; *Proctor v. Butler*, 831 F.2d 1251, 1253 (5th Cir. 1987); *Riggins v. Butler*, 705 F. Supp. 1205, 1208 (E.D. La. 1989); *accord*, *Wainwright v. Sykes*, 433 U.S. 72, 87-88 (1977)

(Louisiana's contemporaneous objection rule is an adequate state bar to federal review of a defaulted claims).

In this case, the Court finds that the state procedural bars imposed pursuant to Jones's failure to comply with La. Code Crim. P. arts. 801 and/or 841, are adequate to bar review of his claims challenging the principal jury charge and the use of Gary Jones's confession at trial.

## C.    <u>Cause and Prejudice</u>

To establish a cause for his procedural default, Jones must demonstrate that "some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986). He has not demonstrated in his pleadings the existence of any objective factor external to the defense that impeded his, or his counsel's, ability to raise this claim in a procedurally proper manner.

There is no obvious cause in the record for the failure to timely or properly challenge the jury charge or the admission of the confession as required by Louisiana law. The law is settled that, "the mere fact that counsel failed to recognize the factual or legal basis for a claim, or failed to raise the claim despite recognizing it, does not constitute cause for procedural default." *Murray*, 477 U.S. at 486. Furthermore, the Court has reviewed all of Jones's ineffective assistance of counsel claims raised herein and finds them to be without merit.

Having failed to show an objective cause for his default, the Court need not determine whether prejudice existed and the petitioner has not alleged any actual prejudice. *See Ratcliff v. Estelle*, 597 F.2d 474 (5th Cir. 1979) (citing *Lumpkin v. Ricketts*, 551 F.2d 680, 681-82 (5th Cir. 1977)).

### D. **Fundamental Miscarriage of Justice**

Alternatively, a petitioner seeking federal habeas review can escape a procedural bar upon a showing that the federal court's failure to review the defaulted claim will result in a fundamental miscarriage of justice. To establish this, petitioner must provide this court with evidence that would support a "colorable showing of factual innocence." *Kuhlmann v. Wilson*, 477 U.S. 436, 454 (1986); *accord Murray*, 477 U.S. at 496; *Glover*, 128 F.3d at 902. "To satisfy the 'factual innocence' standard, a petitioner must establish a fair probability that, considering all of the evidence now available, the trier of fact would have entertained a reasonable doubt as to the defendant's guilt." *Campos v. Johnson*, 958 F. Supp. 1180, 1195 (W.D. Tex. 1997) (footnote omitted); *Nobles*, 127 F.3d at 423 n. 33 (actual innocence factor requires a showing by clear and convincing evidence that "but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.")

In his traverse, Jones urges that a miscarriage of justice will occur if the Court does not review the merits of these claims. Jones, however, has not pointed to any new or existing evidence which would create a reasonable doubt as to his guilt or which would establish his actual innocence. *Murray*, 477 U.S. at 496. Furthermore, the arguments now raised in support of this federal habeas corpus petition were before the state courts and offer no basis for reasonable doubt on habeas corpus review. The Court has also reviewed his *Brady/Kyles* claim and his insufficient evidence claim later in this Report and has found that the claims are meritless. When the petitioner has not factually established his actual innocence, his procedural default can not be excused under the "fundamental miscarriage of justice" exception. *Glover*, 128 F.3d at 903.

Because Jones has not met this alternative exception to the procedural bar, his procedurally defaulted claims challenging the jury charge on principals and the use of Gary Jones's confession must be dismissed with prejudice without review of the merits. The Court, however, will proceed to review the remaining claims.

## V.     Standards of Review of the Merits

The AEDPA standard of review is governed by § 2254(d) and the Supreme Court's decision in *Williams v. Taylor*, 529 U.S. 362 (2000). It provides different standards for questions of fact, questions of law and mixed questions of fact and law.

A state court's determinations of questions of fact are presumed correct and the court must give deference to the state court findings unless they were based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d)(2); *see Hill v. Johnson*, 210 F.3d 481, 485 (5th Cir. 2000), *cert. denied*, 532 U.S. 1039 (2001). The amended statute also codifies the "presumption of correctness" that attaches to state court findings of fact and the "clear and convincing evidence" burden placed on a petitioner who attempts to overcome that presumption. 28 U.S.C. § 2254(e)(1).

A state court's determination of questions of law and mixed questions of law and fact are reviewed under § 2254(d)(1), as amended by the AEDPA. The standard provides that deference be given to the state court's decision unless the decision is "contrary to or involves an unreasonable application of clearly established federal law" as determined by the United States Supreme Court. *Hill*, 210 F.3d at 485.

A state court's decision can be "contrary to" federal law if: (1) the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law; or (2) the state court

decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams*, 529 U.S. at 405-06, 412-13; *Penry v. Johnson*, 532 U.S. 782, 792-93 (2001); *Hill*, 210 F.3d at 485. A state court's decision can involve an "unreasonable application" of federal law if it either: (1) correctly identifies the governing rule but then applies it unreasonably to the facts; or (2) extends or fails to extend a clearly established legal principle to a new context in a way that is objectively unreasonable. *Williams*, 529 U.S. at 406-08, 413; *Penry*, 532 U.S. at 792.

The Supreme Court in *Williams* did not specifically define "unreasonable" in the context of decisions involving unreasonable applications of federal law. *cf. Wright v. West*, 505 U.S. 277, 304 (1992). The court, however, noted that an unreasonable application of federal law is different from an incorrect application of federal law. *See e.g., id.*, at 305; *see also Chambers v. Johnson*, 218 F.3d 360, 364 (5th Cir.), *cert. denied*, 531 U.S. 1002 (2000). "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the state-court decision applied [a Supreme Court case] incorrectly." (brackets in original); *Price v. Vincent*, 538 U.S. 634, 641 (2003) (quoting *Woodford v. Visciotti*, 537 U.S. 19, 24-25 (2002)); *Bell v. Cone*, 535 U.S. 685, 699 (2002).

Thus, under the "unreasonable application" determination, the court need not determine whether the state court's reasoning is sound, rather "the only question for a federal habeas court is whether the state court's determination is objectively unreasonable." *Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002). The burden is on the petitioner to show that the state court applied the precedent to the facts of his case in an objectively unreasonable manner. *Price*, 538 U.S. at 641 (quoting *Woodford*, 537 U.S. at 24-25); *Wright v. Quarterman*, 470 F.3d 581, 585 (5th Cir. 2006).

## VI.    <u>Excessive Sentence (Claim No. 1)</u>

Jones alleges that the Trial Court failed to articulate adequate reasons for imposing the life sentence as required by La. Code Crim. P. art. 984.1.  He contends that the life sentence was excessive in violation of the Eighth Amendment.

Jones's counsel raised this claim on direct appeal to the Louisiana Fourth Circuit.  The Court denied relief finding that the Trial Court did not abuse its discretion in imposing the mandatory life sentence and that Jones failed to overcome the presumption that the sentence was constitutional under the facts of the case.  This was the last reasoned decision on the issue.

A review of the record reflects that the Trial Court informed Jones that it was imposing the statutory penalty of life imprisonment without benefit of parole, probation, or suspension of sentence, which the Court recognized "is not discretionary."[31]  Thus, contrary to Jones's suggestion, the trial court effectively complied with La. Code Crim. P. art. 894.1, which requires that the sentencing court state its reasons for sentencing.

Nevertheless, to the extent Jones argues that his sentence is excessive or otherwise inappropriate under Louisiana law, that claim is not cognizable in this federal proceeding.  Federal habeas corpus relief is available only for violations of federal constitutional law and, therefore, this Court does not sit to review alleged errors of state law.  *Narvaiz*, 134 F.3d at 695.  Accordingly, this Court will not review the state court's findings regarding the constitutionality of Jones's sentence under state law.

With regard to Jones's contention that his sentence is excessive under the Eighth Amendment, his claim is without merit.  If a sentence is within the statutory limits, a federal habeas

---

[31]St. Rec. Vol. 1 of 4, Sentencing Transcript, p. 4, 6/5/98.

court will not upset the terms of the sentence unless it is grossly disproportionate to the gravity of the offense. *Harmelin v. Michigan*, 501 U.S. 957 (1991); *Solem v. Helm*, 463 U.S. 277 (1983). "[W]hen a threshold comparison of the crime committed to the sentence imposed leads to an inference of 'gross disproportionality,'" a court then considers (a) the sentences imposed on other criminals in the same jurisdiction; and (b) the sentences imposed for commission of the same offense in other jurisdictions. *Smallwood v. Johnson*, 73 F.3d 1343, 1346-47 (5th Cir. 1996); *McGruder v. Puckett*, 954 F.2d 313, 316 (5th Cir. 1992).

However, federal courts accord broad discretion to a state trial court's sentencing decision that falls within statutory limits. *Haynes v. Butler*, 825 F.2d 921, 923-24 (5th Cir. 1987); *Turner v. Cain*, 199 F.3d 437 (5th Cir. 1999) (unpublished) (sentence was within Louisiana statutory limits and within trial court's discretion, therefore petitioner failed to state cognizable habeas claim for excessive sentence). Moreover, "if a sentence is within the statutory limits," to obtain habeas relief, the petitioner must show "that the sentencing decision was wholly devoid of discretion or amounted to an 'arbitrary or capricious abuse of discretion,' or that an error of law resulted in the improper exercise of the sentencer's discretion and thereby deprived the petitioner of his liberty." *Haynes*, 825 F.2d at 924 (citation omitted).

Jones was convicted of second degree murder. In Louisiana, "[w]hoever commits the crime of second degree murder shall be punished by life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence." La. Rev. Stat. Ann. § 14:30.1(B). This is the sentence Jones received from the state trial court, and it is the statutorily required sentence for second degree murder.

The sentence was not arbitrary and capricious since it is set as the mandatory sentence. For that same reason, the sentence also was not the product of an error of law that affected the sentencing judge's discretion. The Louisiana statute does not give a sentencing judge any discretion to impose a sentence other than the one Jones received. He has not established it to be excessive.

With regard to proportionality, Jones's sentence is not unconstitutional. The United States Supreme Court has stated that "'[t]he Eighth Amendment does not require strict proportionality between crime and sentence. Rather, it forbids only extreme sentences that are 'grossly disproportionate' to the crime.'" *Ewing v. California*, 528 U.S. 11, 23 (2003) (quoting *Harmelin*, 501 U.S. at 1001 (Kennedy J., concurring in part and concurring in judgment)). The Supreme Court has recognized that only the rare case will reach the level of gross disproportionality. *Id.*, 538 U.S. at 30 (quoting *Harmelin*, 501 U.S. at 1005). As noted above, that disproportionality is judged by whether similar sentences have been imposed for the same offense. *Smallwood*, 73 F.3d at 1346-47.

In this case, Jones's crime was a crime of violence under state law.[32] La. Rev. Stat. Ann. § 14:2. The circumstances of this particular crime included the fact that Jones and his brother obtained guns for the purpose of hunting-down and chasing the victim, who was immediately shot when he was located. The Louisiana courts consistently imposed the mandatory life sentence for second degree murder. *See e.g.*, *State v. Brazley*, 721 So.2d 841 (La. 1998); *State v. Hankton*, 719 So.2d 546 (La. 1998); *State v. Singleton*, 723 So.2d 484 (La. App. 5th Cir. 1998); *State v. Bell*, 721 So.2d 38 (La. App. 5th Cir. 1998); *State v. Wafer*, 719 So.2d 156 (La. App. 2d Cir. 1998). Life sentences have been imposed against defendants convicted of second degree murder in other jurisdictions and

---

[32]*See also*, St. Rec. Vol. 4 of 4, Minute Entry, 7/31/98.

have been upheld as constitutional.  *See United States. v. Hillsberg*, 812 F.2d 328 (7th Cir. 1987); *McDonald v. Tenn.*, 486 F. Supp. 550 (M.D. Tenn. 1980).

Nothing Jones has presented distinguishes his situation from the cases cited above in which the same mandatory sentence was imposed for second degree murder.  Jones's has not rebutted the presumption that the life sentence was proportionate to and appropriate for his crime.  Jones's life sentence without benefit of parole, probation, or suspension of sentence, is not excessive.

For the reasons discussed above, the state courts' finding that Jones's sentence was not excessive was not contrary to established Supreme Court case law, nor was it an unreasonable application of that precedent.  He is not entitled to relief on this claim.

## VII.    State Withheld *Brady/Kyles* Evidence (Claim No. 6(a))

Jones alleges that Brenda Banks testified at trial that she saw Gary Jones shoot his gun during the confrontation prior to the murder.  He argues that this was different from her statement made to the detectives, in which she stated that she was told by Andrews that Gary was shooting at him during that earlier incident.  Under a broad reading, Jones seems to suggests that the State should have disclosed at trial that she was not an eyewitness to the earlier shooting, but was instead simply told about it.  This, he claims, would have addressed her credibility at trial.

The State, in response, indicates that the alleged statement by Banks cannot be located in the record, nor has Jones attached a copy of it to any state court pleadings.  Nevertheless, the State argues that Jones has failed to establish that any favorable evidence, *i.e.* Banks's statement to the police, was suppressed by the State.  Alternatively, assuming Jones's summary of the statement to be correct, Banks's testimony at trial was not in conflict with the statement.

Jones first raised this claim in his application for post-conviction relief, which was denied by the Louisiana Fourth Circuit, and by inference the Louisiana Supreme Court, without stated reasons. *See*, *Ylst*.

Whether evidence is material under *Brady* is a mixed question of law and fact. *Graves v. Dretke*, 442 F.3d 334, 339 (5th Cir. 2006) (citing *Summers v. Dretke*, 431 F.3d 861 (5th Cir.2005)). Thus, under United States Supreme Court precedent, suppression by the prosecution of evidence favorable to the accused "violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87. Three factors must be considered to evaluate an alleged *Brady* violation: (1) the evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; (2) the evidence must have been suppressed by the State, either willfully or inadvertently; and (3) prejudice must have ensued. *Banks v. Dretke*, 540 U.S. 668, 691 (2004) (quoting *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999)).

Considering these elements, evidence is material under *Brady* "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles v. Whitley*, 514 U.S. 419, 433 (1995). In *Kyles*, the Supreme Court extended the *Brady* ideal and held that "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police. But whether the prosecutor succeeds or fails in meeting this obligation (whether, that is, a failure to disclose is in good faith or bad faith, *see Brady*, 373 U.S., at 87, 83 S.Ct., at 1196-1197) the prosecution's responsibility for failing to disclose known, favorable evidence rising to a material level of importance is inescapable." *Kyles*, 514 U.S. at 438.

The United States Fifth Circuit has outlined the four factors used to determine materiality under *Brady* and *Kyles*:

> The *Kyles* decision emphasizes four aspects of materiality. First, "a showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal (whether based on the presence of reasonable doubt or acceptance of an explanation for the crime that does not inculpate the defendant)." 514 U.S. at 434, 115 S.Ct. 1555. The question is not whether the defendant would have received a different verdict with the disclosed evidence, but "whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Id.* A "reasonable probability of a different result" is shown when the suppression "undermines confidence in the outcome of the trial." *Id.*
>
> Second, the materiality test is not a test of the sufficiency of the evidence. The defendant need not demonstrate that after discounting the inculpatory evidence by the undisclosed evidence that there would not have been enough evidence to sustain the conviction. Rather, a *Brady* violation is established by showing "that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id.* at 435, 115 S.Ct. 1555. Third, harmless error analysis does not apply. *Id.* Fourth, "materiality to be stressed here is its definition in terms of suppressed evidence considered collectively, not item by item." *Id.* at 436, 115 S.Ct. 1555.

*Graves v. Dretke*, 442 F.3d 334, 339-40 (5th Cir. 2006). Information also is not material under *Brady* if it is merely cumulative of other evidence already before the fact finder. *Spence v. Johnson*, 80 F.3d 989, 995 (5th Cir.1996).

*Brady* applies equally to evidence relevant to the credibility of a key witness in the state's case against a defendant. *Giglio v. United States*, 405 U.S. 150 (1972). The prosecution's suppression of impeachment evidence requires a showing that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v. Holley*, 23 F.3d 902, 914 (5th Cir. 1994) (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)).

Further, claims pursuant to *Brady* involve "the discovery of evidence <u>after trial</u> of information which had been known to the prosecution but unknown to the defense." (Emphasis added) *Lawrence v. Lensing*, 42 F.3d 255, 257 (5th Cir. 1994) (*quoting United States v. Agurs*, 427 U.S. 97, 103 (1976)). Thus, "when information is fully available to a defendant at the time of trial and his only reason for not obtaining and presenting the evidence to the Court is his lack of reasonable diligence, the defendant has no *Brady* claim." *United States v. Brown*, 628 F.2d 471, 473 (5th Cir. 1980); *Kutzner v. Cockrell*, 303 F.3d 333, 336 (5th Cir. 2002) (holding that *Brady* does not require prosecutors to furnish a defendant with exculpatory evidence if that evidence is fully available to the defendant through an exercise of reasonable diligence); *Rector v. Johnson*, 120 F.3d 551, 558-59 (5th Cir. 1997) (holding that the State has no duty to lead the defense toward potentially exculpatory evidence if the defendant possesses the evidence or can discover it through due diligence). *Brady* also does not place any burden upon the prosecution to conduct a defendant's investigation or assist in the presentation of the defense's case. *United States v. Marrero*, 904 F.2d 251, 261 (5th Cir. 1990) (citations omitted); *Bigby v. Cockrell*, 340 F.3d 259, 279 (5th Cir. 2003) (concluding that *Brady* did not obligate prosecutors to provide the defendant's trial counsel with copies of his client's jail medical records, which showed the number of psychotropic medications that defendant was taking while incarcerated and awaiting trial, because defense counsel could have obtained the records by exercising reasonable diligence).

Jones references an alleged exchange between Banks and Detective John Ronquillo, in which he contends Banks stated that she did not actually see the first exchange of fire between the Joneses and Andrews. First, Jones has not provided the Court with a copy of that statement and, as noted by the State, the statement is not part of the state court record. It is also significant that Jones does

not indicate when the statement was provided or discovered by the defense, which is crucial to a finding under *Brady*.

Second, even assuming the statement as presented is accurate, Jones misconstrues the statement attributed to Banks. That is, in the quoted portion appearing in his brief, Banks did not deny seeing the exchange of gunfire. To the contrary, the statement reflects that she saw the exchange of gunfire between Gary Jones and Andrews, and that she later was told the names of the men she saw engaged with Andrews. This, is in fact, the same as her testimony at trial. She testified at trial that she saw Gary shoot at Andrews in the courtyard, but did not learn the names of the Joneses, i.e. the men she saw, until after that incident.[33]

Furthermore, as argued by the State, Jones has not alleged that the State actually withheld any statement made by Brenda Banks. A review of the record reveals that Jones's counsel filed for extensive discovery from the State, including witness statements and identifications.[34] The motion was answered and defense counsel was satisfied.[35] In addition, during the suppression hearing on October 27, 1997, Detective Ronquillo testified that he met with Banks on May 26, 1995, "for the rendering of a statement to her knowledge of the murder of the victim, and to display a photographic line-up to her."[36] At that point prior to trial, counsel was placed on notice that Banks either gave, or could have given, a statement to Ronquillo on that date. With some diligence, that statement would have been attainable from the State before trial, if in fact it was not already provided.

---

[33]*See* St. Rec. Vol. 2 of 4, Trial Transcript, pp. 196-198, 213, 4/22/98.

[34]St. Rec. Vol. 4 of 4, Motion for Discovery and Inspection, 12/4/95.

[35]St. Rec. Vol. 4 of 4, Hearing Minutes, 10/27/97.

[36]St. Rec. Vol. 1 of 4, Hearing Transcript, p. 25, 10/27/97.

For the foregoing reasons, Jones has failed to establish that the State withheld any *Brady/Kyles* evidence from Banks, or that Banks's statement was material to the defense in light of her testimony at trial. The state courts' denial of relief on this claim was not contrary to, or an unreasonable application of, Supreme Court law. Jones is not entitled to relief on this claim.

## VIII. Erroneous Jury Instruction on Reasonable Doubt (Claim No. 8(a))

Jones alleges that the Trial Court gave an erroneous jury instruction on the definition of reasonable doubt. Specifically, he complains that the Trial Court instructed the jury that a reasonable doubt was a serious doubt and a doubt for which one could give a good reason, in violation of the holding in *Humphrey v. Cain*, 138 F.3d 552 (5th Cir. 1998). The State argues in its opposition that Louisiana's law on jury charges is not contrary to federal law.

This claim was raised by Jones's on post-conviction review. However, his application was denied without stated reasons.

The *Humphrey* case relied upon by Jones is not Supreme Court precedent for purposes of the *Williams* standard applicable to this § 2254 petition. The AEDPA restricts federal habeas review to the clearly established law of the United States Supreme Court and not the jurisprudence of the circuit courts applying that precedent. *Bell v. Jarvis*, 236 F.3d 149, 162 (4th Cir. 2000); *Welch v. City of Pratt, Kansas*, 214 F.3d 1219, 1222 (10th Cir. 2000); *Bocian v. Godinez*, 101 F.3d 465, 471 (7th Cir. 1996). This Court must therefore look to the opinions of the Supreme Court and not the Fifth Circuit's *Humphrey* opinion to determine whether Jones is entitled to relief on this claim. *Accord, Warren v. Kyler*, 422 F.3d 132 (3rd Cir. 2005) ("it is clear from the terms of Section 2254(d)(1) that only Supreme Court law is included, and *Williams*[, 529 U.S. at 412] further narrows the field to the holdings as opposed to the dicta of that Court"). The Court also notes that the State's

reliance on state law to address this issue in its opposition is misplaced, since federal law controls here.

The reasonable doubt standard is so important that the United States Supreme Court has held that the Due Process Clause of the Fourteenth Amendment protects the accused against conviction in a state criminal trial except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged. *In re Winship*, 397 U.S. 358, 364 (1970). The Constitution, however, neither prohibits trial courts from defining reasonable doubt nor requires them to do so as a matter of course. *Victor v. Nebraska*, 511 U.S. 1, 5-6 (1994) (citing *Hopt v. Utah*, 120 U.S. 430, 440-41 (1887)). The due process standard also does not require the use of any specific wording or formulation; all that is required is that the jury be instructed to find the defendant's guilt beyond a reasonable doubt. *Id.*, 511 U.S. at 5.

When a Court chooses to define reasonable doubt and does so using a constitutionally deficient instruction, this is a structural error in the trial proceeding that is so severe that it is not subject to the harmless error analysis and it is entitled to retroactive application. *Sullivan v. Louisiana*, 508 U.S. 275 (1993) (instruction not subject to harmless error analysis); *Humphrey v. Cain*, 138 F.3d 552 (5th Cir. 1998) (retroactive application to convictions that were final at the time *Cage* was decided). The issue therefore is whether there is a reasonable likelihood that the jury understood the instruction to allow a conviction based upon proof insufficient to meet the *In re Winship* standard. With respect to a reasonable doubt charge, the proper inquiry is whether there is a "reasonable likelihood" that the jury improperly applied the instructions. *Victor v. Nebraska*, 511 U.S. 1, 6 (1994).

In *Taylor v. Kentucky*, 436 U.S. 478 (1978), the Supreme Court expressed its concern over a reasonable doubt instruction which defined reasonable doubt as substantial doubt, because "though perhaps not in itself reversible error, often has been criticized as confusing." *Id.*, at 488. Twelve years later, the Court held that such a definition, combined with the phrases "grave uncertainty" and "moral certainty," violated the Due Process Clause. *See Cage v. Louisiana*, 498 U.S. 39 (1990). In *Cage*, the jurors were instructed:

> [A reasonable doubt] is one that is founded upon a **real tangible substantial basis** and not upon **mere caprice and conjecture**. It must be such doubt as would give rise to a **grave uncertainty**, raised in your mind by reasons of the unsatisfactory character of the evidence or lack thereof. A reasonable doubt is not a mere possible doubt. It is an actual **substantial doubt**. It is a doubt that a reasonable man can seriously entertain. What is required is not an absolute or mathematical certainty, but a **moral certainty**.

*Id.*, at 40 (quotation omitted).

The *Cage* Court held that the emphasized portions of the instruction rendered it unconstitutional. The Court noted that the words "substantial" and "grave," as commonly understood, suggested a higher degree of doubt than is required for acquittal under the reasonable doubt standard. These terms combined with "moral certainty" as used in that charge, rather than evidentiary certainty, could lead a juror to allow a finding of guilt based upon a lesser degree of proof than required by the Constitution.

Four years later, in *Victor*, 511 U.S. at 1, the Supreme Court again considered jury instructions defining reasonable doubt. The *Victor* Court reviewed two different instructions from consolidated cases and held that each was constitutionally adequate. One of the instructions at issue in *Victor* read:

> "Reasonable doubt" is such a doubt as would cause a reasonable and prudent person, in one of the grave and more important transactions of life, to pause and hesitate before taking the represented facts as true and relying and acting thereon. It is such a doubt as will not permit you, after full, fair and impartial consideration of all the

evidence, to have an abiding conviction, to a **moral certainty**, of the guilt of the accused. At the same time absolute or mathematical certainty is not required. You may be convinced of the truth of a fact beyond a reasonable doubt and yet be fully aware that possibly you may be mistaken. You may find an accused guilty upon the strong probabilities of the case, provided such probabilities are strong enough to exclude any doubt of his guilt that is reasonable. A reasonable doubt is an **actual and substantial doubt reasonably arising from the evidence**, from the facts or circumstances shown by the evidence or from the lack of evidence on the part of the State, as distinguished from a doubt arising from mere possibility, from bare imagination, or from **fanciful conjecture**.

*Id.*, at 18 (emphasis added).

The court in *Victor* agreed that the equation of reasonable doubt with a substantial doubt was problematic. The Court distinguished the instruction from that given in *Cage*, noting that the ambiguity in the phrase "substantial" was removed by reading the phrase in the context of the sentence in which it appeared; which was, that the doubt must reasonably arise from the evidence.

Four years after *Victor*, the Fifth Circuit in *Humphrey*, reviewed a slightly different charge containing the *Cage* terms and the phrase "for which you could give good reason." This language is referred to as the "articulation requirement." The court held that to require the jury to find a "serious doubt for which you could give good reasons," lightened the State's burden and removed a substantial protection assured to the defendant. It noted that requiring the articulation of a "good reason" skews the deliberation process in favor of the State by suggesting that those with doubts must perform certain actions in the jury room, actions that many individuals find difficult or intimidating, before they may vote to acquit. It is in this circuit court holding that Jones bases the instant claim.

The entire instruction on reasonable doubt given to the jury at Jones's trial is transcribed as

follows:[37]

> If you entertain any reasonable doubt as to any of the facts or elements necessary to constitute the defendants' guilt, it is your sworn duty to give them the benefit of that doubt and return a verdict of not guilty.
>
> Even where the evidence demonstrates the probability of guilt, yet if it does not establish it beyond a reasonable doubt you must acquit the accused.  **This doubt must be a reasonable one, that is, one found upon a real, tangible basis, and not upon a mere caprice or fancy of a conjecture.**
>
> It must be such a doubt that it gives rise to an uncertainty raised in your mind by reason of the unsatisfactory character of the evidence, one that would make your [sic] feel that you have not an abiding conviction of a defendant's guilt.
>
> **If after giving a fair and impartial consideration to all the facts in the case you find the evidence unsatisfactory upon any single point, indispensably necessary to constitute the defendant's guilt, this would give rise to such a reasonable doubt as to return a verdict of not guilty.**
>
> The prosecution must establish by legal and sufficient evidence beyond a reasonable doubt, but the rule does not go further and require a preponderance of the testimony, it is incumbent on the State to prove the events charged are legally included in the indictment to your satisfaction and beyond a reasonable doubt.  And when we say "legally included in the indictment," we are talking about responsive verdicts in this case.  There is guilty as charged of second degree murder, guilty of manslaughter, and not guilty.
>
> A reasonable doubt is not a mere possible doubt, it should be an actual doubt. It is such a doubt as a reasonable man would seriously entertain.  *It is a serious doubt for which you could give a good reason*.
>
> And when were [sic] selecting the jury we were talking and I said that one of the definitions I like to look - or let you reflect upon is, when you go back in the jury, after - when we talk about the twelve deciding the case, and somebody says, "I have a doubt."  The other eleven could ask him why they have a doubt.  "Why do you have the doubt?"  And they have to be able to articulate a reason for having that doubt.
>
> They could say lack of evidence, they say "I don't believe this witness," they could say anything they want to say, but it's got be an articulable [sic] reason, a reason for the doubt.
>
> And do you remember when I was talking, I said, put you back in that same scenario, and I said the other eleven jurors ask that jury [sic] said they have a doubt, and the person - and I made the hypothet - I said that the person would say they didn't know, they just didn't feel right about it, and I said that was not enough?  And it is not enough.  Because [sic] only obligation the State has to prove this case

[37]St. Rec. Vol. 2 of 4, Trial Transcript, pp. 271-273, 4/22/98.

beyond a reasonable doubt, and if somebody has a doubt, but they can't really articulate a reason, it is just a feeling, or whim, that is not a reasonable doubt. And the State is not placed with that responsibility or that burden in the case.

(Emphasis added)

Jones complains of the *Humphrey* type language in the instruction, italicized in the above quote, which in this case reads: "It is a serious doubt for which you could give a good reason." The Court in *Humphrey* referred to this as a "potent qualifier," when coupled with the forbidden language from *Cage*, "substantial doubt," "grave uncertainty," and "moral certainty," all of which were contained in the charge given in *Humphrey*, which was made unconstitutional. The *Humphrey* charge also did not contain the curative language from *Victor*, which refers the jury back to the evidence to form the basis of the doubt.

In Jones's case, the only arguably questionable language is the "serious doubt" reference. The *Humphrey* court, however, chose not to decide whether the "serious doubt" language alone was sufficient to deprive a defendant of due process. *Humphrey*, 120 F.3d at 531. In fact, there are no Supreme Court or Fifth Circuit opinions which have disallowed a charge like that used in Jones's case or one wholly similar. The Supreme Court has never expressed disfavor with the articulation language in *Humphrey*. *See Williams v. Cain*, 229 F.3d 468, 478 (5th Cir. 2000) (quoting *Muhleisen v. Ieyoub*, 168 F.3d 840, 844 n.2 (5th Cir. 1999).

Here, the charge given had none of the prohibited *Cage* language. The charge also contained the *Victor*-type curative language, underlined in the quote above, where it instructed the jury that the evidence must be the basis of any reasonable doubt. Read as a whole, the charge in Jones's case does not demonstrate the type of instruction that "skews the deliberation process" or that diminishes the State's burden, like those prohibited in *Cage* and *Humphrey*.

The court finds that, based on the charge as a whole, Jones has not established that "[t]here is . . . reasonable likelihood that the jurors who determined petitioner's guilt applied the instructions in a way that violated the Constitution." *Victor*, 511 U.S. at 22-23. The state courts' denial of relief on this claim was neither contrary to nor an unreasonable application of Supreme Court precedent. Jones is not entitled to relief on this claim.

## IX.    <u>Suggestive Photographic Identification Process (Claim No. 10(a))</u>

Jones argues that the state court made rulings regarding the identification evidence which were contrary to federal law. Specifically, he alleges that the testimony at trial reflected some confusion about the photographic line-ups presented to Brenda Banks. He also refers to the transcript of the suppression hearing during which there was confusion over the batches of pictures, which had become separated. He also argues that the inclusion of his twin's picture in the line-up was suggestive, since Banks already knew he had a twin. He contends that her inability to distinguish between him and his twin taints the reliability of the identification.

These arguments were first asserted on direct appeal, when Jones challenged the denial of the motion to suppress the identification. He also raised it in his application for post-conviction relief, which was denied by the state courts without written reasons.

In the last reasoned opinion by the Louisiana Fourth Circuit, the court relied upon the factors outlined in *Manson v. Brathwaite*, 432 U.S. 98 (1977), and related state law, to find that the identifications made by Banks were not suggestive. The Court found that the array of pictures did not display Terry Jones or his twin brother so singularly so as to focus Banks's attention on either of them. The Court also determined that Banks knew the Joneses and saw them at the shooting and in a separate incident earlier that evening. The Court also found that the presence of the victim's

mother at the line-up was not influencing since Banks denied discussing anything with her before or during the line-ups.

In *Simmons v. United States*, 390 U.S. 377 (1968), the United States Supreme Court set forth a two prong test for the exclusion of identifications based on impermissibly suggestive photo arrays which deny due process. The first prong requires a determination of whether the identification procedure was impermissibly suggestive. If it is not, the inquiry ends. If it is, a separate inquiry must be made as to whether, under the totality of the circumstances, the suggestiveness leads to a substantial likelihood of irreparable misidentification.

Later, in *Manson v. Brathwaite*, 432 U.S. at 114-16, cited by the Louisiana Fourth Circuit, the Supreme Court reaffirmed several factors enumerated in *Neil v. Biggers*, 409 U.S. 188, 199 (1972), that should be considered when reviewing the reliability of a witness's identification. These include: (1) the opportunity of the witness to view the subject; (2) the witness's degree of attention; (3) the accuracy of the description; (4) the witness's level of certainty; (5) the elapsed time between the crime and the identification; and (6) the corrupting influence of the suggestive identification itself. *Passman v. Blackburn*, 652 F.2d 559, 570-71 (5th Cir. 1981); *Herrera v. Collins*, 904 F.2d 944, 946 (5th Cir. 1990).

The state trial court held hearings on the Joneses' motion to suppress the identifications and that testimony was reestablished at trial before the jury. A review of the two transcripts reflect virtually identical testimony in each from Banks and Detective Patrick Young, the officer who conducted the photographic line-up relevant to Terry Jones.

At the suppression hearings, with respect to that line-up, Detective Young testified that he met Banks outside of a home on Dumaine Street between Claiborne and Robertson.[38] This was the home of the victim's mother.[39] The meeting was about one month after the murder. He did not recall if anyone else was present.[40] He presented her with a line-up of eight pictures, including Terry Jones, his twin Kerry, and other "fill-ins."[41] He showed her the photographs outside of his car under a light.[42] He stated that Banks picked out two photographs, and told him that it was one of the twins who did it.[43] She could not tell which one, but she knew it was one of them.[44] He denied forcing her or coercing her in any way.[45] He also denied suggesting to her which photograph to pick.

At trial, Detective Young testified that he showed a line-up to Banks which contained a picture of Terry Jones and his twin brother, whom the District Attorney erroneously referred to during questioning as Gary (the co-defendant) rather than Kerry.[46] He stated that Banks was unable to distinguish between the twins, but she knew one of them was involved in the shooting.[47] He

---

[38]St. Rec. Vol. 1 of 4, Hearing Transcript, p. 11, 10/27/97; St. Rec. Vol. 2 of 4, Trial Transcript, p. 24, 4/21/98.

[39]*Id*., at p. 14.

[40]*Id*., at p. 14.

[41]*Id*., at p. 11; St. Rec. Vol. 2 of 4, Trial Transcript, p. 25, 4/21/98.

[42]*Id*., at p. 14, 15.

[43]*Id*., at p. 12; St. Rec. Vol. 2 of 4, Trial Transcript, p. 25, 4/21/98.

[44]*Id*., at pp. 12-13.

[45]*Id*., at p. 13.

[46]St. Rec. Vol. 2 of 4, Trial Transcript, p. 104-105, 4/21/98

[47]*Id*., at p. 105.

recalled that the victim's mother, Lois Nelson, was present, but she was not by the vehicle when the pictures were shown.[48]

At the suppression hearings, Banks testified, with respect to Terry Jones's identification, that she viewed photographs brought to her by an officer outside of the home of the victim's mother.[49] It was night, but there were lights.[50] She also denied having a conversation with Lois Nelson before or during the identification.[51] The detective showed Banks the pictures on the hood of his car. He presented them in two batches.[52]

She also denied that the detective suggested who she should pick out of the photographs.[53] Banks also testified that she was very close to the shooting, with only bushes between her and the scene.[54] She recalled that she viewed the photographs at least one week after the shooting, although she was not sure how long it had been.[55] She stated that she had seen Jones around the projects before the shooting but she did not know him.[56] She knew he was a twin, but she could not tell them apart in the pictures.[57]

---

[48]*Id.*, at p. 144.

[49]St. Rec. Vol. 1 of 4, Hearing Transcript, p. 3, 1/13/98.

[50]*Id.*, at pp. 14, 15.

[51]*Id.*, at p. 9.

[52]*Id.*, at p. 4.

[53]*Id.*, at pp. 11, 12, 15, 16.

[54]*Id.*, at p. 6.

[55]*Id.*, at pp. 13-14.

[56]*Id.*, at p. 16.

[57]*Id.*, at p. 17-18.

At trial, Banks testified that she knew Gary and Terry Jones from the housing project, but she did not know their names.[58] She did not meet the victim's mother until after the murder.[59] On the night of the murder, she first saw the Jones brothers during the evening of the first shooting in the courtyard.[60] She saw them again immediately before and during the shooting, when Andrews was killed.[61] She saw Gary shoot Andrews from close by and she then hid in the bushes.[62]

Banks further testified that she was shown a set of pictures in which she identified Terry Jones as one of the participants.[63] She testified that she did not know prior to the shooting that Terry had a twin.[64] She found out the day after the shooting that there was a twin, and she did not know which one it was that she saw.[65] She picked the two pictures of the twins because they looked alike.[66] She denied that the victim's mother told her who committed the murder before the photographic line-up.[67] She stated that Mrs. Nelson did tell her that the Jones's had been arrested.[68]

Considering this testimony and applying the foregoing legal standards, the Court concludes that there was no suggestive act by Detective Young or under the circumstances during the

---

[58]St. Rec. Vol. 2 of 4, Trial Transcript, p. 196, 4/22/98.

[59]*Id.*, at p. 197.

[60]*Id.*, at pp. 197-98.

[61]*Id.*, at pp. 201, 203-04.

[62]*Id.*, at pp. 205-06.

[63]*Id.*, at p. 208.

[64]*Id.*, at pp. 208-09.

[65]*Id.*, at pp. 211.

[66]*Id.*, at pp. 209-210.

[67]*Id.*, at p. 224.

[68]*Id.*, at p. 224.

identification procedures. There was no evidence of undue suggestiveness by law enforcement authorities or by the victim's mother, and the manner in which Jones was identified by Banks was not impermissibly suggestive.

Even assuming that some indication of suggestiveness existed, a finding this Court does <u>not</u> make, there was no substantial risk of misidentification, and federal habeas relief is wholly unwarranted. In this case, Banks had every opportunity to view Jones at close range before and at the time of the fatal shooting. She had seen Jones before and knew him by face from the neighborhood. She identified him by recognition in the photographs.

The Court notes that Jones also suggests that the State may have engaged in manipulation of the photographs during the suppression hearing. This is apparently based on the following occurrence at the second hearing on January 13, 1998. After receiving testimony from Banks at that hearing, the Trial Court discovered that the pictures from the two distinct line-ups had become commingled during the testimony.[69] Although each set was dated and marked, the Court was unsure if the witness had been questioned about pictures from both meetings as if they were one. The Court left open the matter to obtain testimony from the detectives who bundled the line-ups so that the pictures could be reorganized. This matter was rectified prior to and during the third part of the suppression hearing, on the morning of trial, when the detectives identified the respective sets of photographs presented to Banks at the separate line-ups. Jones's argument on this point is *non sequitur* and does not present a basis for habeas relief or change the fact that the identification process was proper.

---

[69]St. Rec. Vol. 1 of 4, Hearing Transcript, pp. 20-21, 1/13/97.

In view of the testimony presented and the record as a whole, there was no suggestive component or substantial risk of misidentification as a result of the identification process. The state courts' denial of relief on this claim was not contrary to, or an unreasonable application of, Supreme Court precedent. Jones is not entitled to relief on this claim.

## X.    Erroneous Jury Instruction on Evidence (Claim No. 13)

Jones claims that the Trial Court's definition of evidence to be relied upon by the jury was improper and deprived him of the ability to present a defense argument based on his demeanor. Specifically, Jones argues that the Court gave a legally adequate instruction limiting the jury to consider only the evidence presented from the stand, except as it pertains to his case. He claims that, as witnesses were testifying, he would move his head in disagreement "in hopes that the jury would observe his response." He suggests that, since no defense witnesses were called and the jury could not consider counsel's arguments as evidence, this "head movement" was his only defense. Thus, he argues, the Court's jury instruction denied him his right to present this defense.

The State cursorily argues that the claim was properly denied "for obvious reasons," without legal argument. This claims was raised on post-conviction review and the state courts denied relief without written reasons.

In connection with the instant claim, Jones concedes that the Trial Court's definition of evidence is "routine,"[70] and he does not challenge it except that, as applied to him, it denied him the right to present his head-moving defense. Thus, he does not challenge the constitutionality of the charge itself. Instead, he challenges the Trial Court's limitation of the evidence to be considered by

---

[70]Rec. Doc. No. 1-2, p. 47.

the jury to the testimony received from the stand, to the extent that limitation affected his ability to put on his head-movement defense.

The Supreme Court has held that "[w]hether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" (citations omitted) *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (quoting *California v. Trombetta*, 467 U.S. 479, 485 (1984)). The Court recognized further that "an essential component of procedural fairness is an opportunity to be heard. *Id*.

The Supreme Court has also held that "a defendant's right to present relevant evidence is not unlimited, but rather is subject to reasonable restrictions." *U.S. v. Sheffer*, 523 U.S. 303, 308 (1998). The ability to present such evidence may be crafted by the courts "'to accommodate other legitimate interests in the criminal trial process.'" *Rock v. Arkansas*, 483 U.S. 44, 55 (1987) (quoting *Chambers v. Mississippi*, 410 U.S. 284, 295 (1973). Rules excluding evidence from criminal trials do not abridge an accused's right to present a defense so long as they are not "arbitrary" or "disproportionate to the purposes they are designed to serve." *Rock*, 483 U.S. at 56. The Supreme Court has found the exclusion of evidence to be unconstitutionally arbitrary or disproportionate only where it has been found to infringe upon a weighty interest of the accused. *Sheffer*, 523 U.S. at 308.

In line with this rule, the Supreme Court has declared that an accused "is entitled to have his guilt or innocence determined solely on the basis of the evidence introduced at trial, and not on grounds of official suspicion, indictment, continued custody, or other circumstances not adduced as proof at trial." *Taylor v. Kentucky*, 436 U.S. 478, 485 (1978). The Due Process Clause is the

safeguard "against dilution of the principle that guilt is to be established by probative evidence and beyond a reasonable doubt." *Estelle v. Williams*, 425 U.S. 501, 503 (1976).

The Court can not locate any Supreme Court precedent to support Jones's contention that he had a right to present a head-movement defense. This Court has thoroughly searched this country's legal precedent and can locate no case, Supreme Court or otherwise, which would consider the head-movement of an unsworn defendant to constitute probative evidence which would be admissible at trial to establish innocence or guilt. In fact, the federal courts have held that it is <u>improper</u> for a jury to be called upon to consider the courtroom demeanor and gestures of a defendant who has not testified. *Accord*, *United States v. Schuler*, 813 F.2d 978 (9th Cir. 1987) (defendant's laughter during witness testimony could not be considered as evidence in guilt determination); *United States v. Pearson*, 746 F.2d 787 (11th Cir. 1984) (defendant's behavior off of the witness stand. i.e. nervous shaking of his leg, was not evidence to be considered by jury); *United States v. Carroll*, 678 F.2d 1208 (4th Cir. 1982) (defendant's pointing at picture-evidence while speaking with his counsel was not evidence); *United States v. Wright*, 489 F.2d 1181 (D.C. Cir. 1973) (defendants' demeanor and emotional response to testimony was not evidence to be used in determining guilt or innocence); *see also*, *United States v. Mendoza*, 522 F.3d 482, 497 (5th Cir. 2008) (DeMoss, C.J. dissenting) ("the prosecutor's comments during closing arguments comparing Mendoza's calm demeanor at the border with his calm demeanor in the courtroom violated Mendoza's Fifth Amendment due process right to have his guilt or innocence determined solely on the basis of the evidence introduced at trial"). Thus, it is well settled that "a defendant's non-testimonial courtroom behavior is not evidence subject to comment." *Gomez v. Ahitow*, 29 F.3d 1128, 1136 (7th Cir. 1994).

Jones can not articulate to this Court a cognizable constitutional violation resulting from his inability to have the jury consider his head-moving as evidence in defense of the charge he faced. He has not established that the state courts' denial of relief on this claim was contrary to, or an unreasonable application, of any Supreme Court precedent. He is not entitled to relief.

## XI.   Racial Discrimination in the Grand Jury Foreperson Selection (Claim No. 14(a))

Jones alleges that the Trial Court obtained its jurisdiction from an indictment issued by a grand jury impaneled under La. Code Crim. P. art. 413(C), which was a local law later found to be violative of the Louisiana Constitution. He argues that this law violated his due process and equal protection rights under the Fourteenth Amendment of the United States Constitution. He alternatively argues that the systemic exclusion of African-Americans from service as grand jury forepersons under La. Code Crim. P. art. 413(C) is a structural error which entitled him to relief from his conviction.

Jones raised this claim in his application for post-conviction relief, which was denied without stated reasons by the Louisiana Fourth Circuit and the Louisiana Supreme Court.

At the time of Jones's indictment, La. Code Crim. P. art. 413(C) provided the grand jury selection process for Orleans Parish:

> In the parish of Orleans, the court shall select twelve persons plus a first and second alternate for a total of fourteen persons from the grand jury venire, who shall constitute the grand jury. The court shall thereupon select one of the jurors to serve as foreman.

La. Code Crim. Proc. art. 413(C) (emphasis added) (prior to repeal by Acts 2001, No. 281, §§ 1, 2).

Thus, under the law in effect in Louisiana in 1998, a criminal district court judge selected the foreperson of the grand jury after the grand jury had been impaneled. The Louisiana legislature repealed Article 413(C) in 2001, with the effect that selection of the foreperson in Orleans Parish

since that date occurs in the same manner as it now does in the rest of Louisiana.[71]  The Louisiana Supreme Court also addressed the earlier version of the statute in 2003 concerning indictments that had been handed down in 1999.  *State v. Dilosa*, 848 So. 2d 546, 551 (La. 2003).

In *Dilosa*, the Louisiana Supreme Court determined that La. Code Crim. P. art. 413(C), which set forth the process for selection of grand juries in Orleans Parish prior to the 2001 amendment, failed to provide the procedural protections required by the Louisiana Constitution.  *Id.*, at 546.  This holding by the State's highest court is not relevant to the standards to be used by this Court on habeas review to determine whether Jones is entitled to relief.

This federal court does "not sit as [a] 'super' state supreme court in a habeas corpus proceeding to review errors under state law."  *Wilkerson v. Whitley*, 16 F.3d 64, 67 (5th Cir. 1994) (quotation omitted).  Jones's claim that Article 413(C) violated the state constitution is not a ground for federal habeas corpus relief.  *See Parker v. Cain*, 445 F. Supp.2d 685, 697 n.23 (E.D. La. 2006) (Duval, J.);  *Moore v. Cain*, No. 05-1823, 2007 WL 734815, at *11 (E.D. La. Mar. 6, 2007) (Berrigan, J.); *Varnado v. Cain*, No. 02-1286, 2004 WL 2984804 at *5 (E.D. La. Dec. 21, 2004) (Duval, J.).

This Court's analysis focuses instead on federal due process considerations, and due process requires that the court grant the writ only when the errors of the state court make the underlying proceeding fundamentally unfair.  *Neyland  v. Blackburn*, 785 F.2d 1283, 1293 (5th Cir. 1986).  Thus, the Court only can consider Jones's arguments to the extent he bases them on federal constitutional law.

---

[71]Some lower courts in Louisiana had already held, before the legislature acted, that Article 413(C) was unconstitutional under the Louisiana Constitution because it was an impermissible local law.

Under a broad reading, Jones's alleges that the systematic exclusion of African-Americans through the application of La. Code Crim. P. art. 413(C) was a structural error which violated concepts of due process and equal protection. As noted above, the United States Supreme Court has never addressed the constitutionality or impact of La. Code Crim. P. art. 413(C). Although not cited by Jones or the State in this case, in *Campbell v. Louisiana*, 523 U.S. 392 (1998), the Supreme Court had occasion to consider the similar and also now repealed pre-1999 version of La. Code Crim. P. art. 413(B), which involved grand jury selections in the parishes other than Orleans Parish. Although *Campbell* does not directly entitle Jones's to relief, the holding in that case is informative in addressing Jones's broadly stated due process and equal protection arguments.

In *Campbell*, the Supreme Court addressed La. Code Crim. P. art. 413(B), which again was not applicable to Orleans Parish where Jones was prosecuted. Prior to *Campbell*, La. Code Crim. P. art. 413(B) provided as follows:

> In parishes <u>other than</u> Orleans, <u>the court shall select one person from the grand jury venire to serve as foreman of the grand jury</u>. The sheriff shall draw indiscriminately and by lot from the envelope containing the remaining names on the grand jury venire a sufficient number of names to complete the grand jury.

La. Code Crim. Proc. art. 413(B) (emphasis added) (prior to amendment by Acts 1999, No. 984, § 1, approved July 9, 1999). Thus, under the pre-July 1999 law in Louisiana in parishes other than Orleans,

> the judge selects the foreperson from the grand jury venire before the remaining members of the grand jury have been chosen by lot. . . . As a result, when the Louisiana judge selected the foreperson, he also selected one member of the grand jury outside of the drawing system used to compose the balance of that body. These considerations require us to treat the case as one alleging discriminatory selection of grand jurors.

*Campbell*, 523 U.S. at 396. The Louisiana legislature amended Article 413(B) in July 1999 to delete the emphasized language in the quotation above and to provide instead for random selection of the foreperson from among the already impaneled grand jury members. La. Code Crim. Proc. art. 413(B) (as amended by Acts 1999, No. 984, § 1).[72]

In the aftermath of *Campbell*, the United States Fifth Circuit resolved that, "to be entitled to habeas relief [in a case alleging unconstitutional grand jury selection,] a claimant is required to <u>prove discrimination</u> under the standards set out in the Supreme Court's cases." *Rideau v. Whitley*, 237 F.3d 472, 484-85 (5th Cir. 2000) (emphasis added) (citing *Rose v. Mitchell*, 443 U.S. 545, 565 (1979)). The Supreme Court in *Campbell*, 523 U.S. at 396, emphasized that the criminal defendant must show, as a precondition to raising a third-party due process or equal protection challenge, that he suffered an "injury in fact" from the exclusion of African-Americans from the grand jury. The Court explained:

> Regardless of his or her skin color, the accused suffers a significant injury in fact when the composition of the grand jury is tainted by racial discrimination. Discrimination on the basis of race in the selection of members of a grand jury . . . strikes at the fundamental values of our judicial system because the grand jury is a central component of the criminal justice process.

*Id.*, at 398 (quotation omitted). Furthermore, "[t]o assert the rights of those venirepersons who were excluded from serving on the grand jury in his case, [petitioner] must prove their exclusion was on account of intentional discrimination." *Id.*

---

[72]The 1999 amendment applied to all parishes <u>other than Orleans Parish</u>. As noted above, part C of the article was amended again in 2001 to delete the exceptions for Orleans Parish. Acts 2001, No. 281, § 1.

In the instant case, Jones has not demonstrated any race or gender[73] discrimination in the selection of the foreperson or the grand jury that indicted him. In connection with this claim, Jones has not directly submitted any documentation or other evidentiary support for his claims. However, based on the record before the Court, the only support presented to the state courts were allegedly provided to a state trial court in connection with a similar claim in *State v. Trainor*, Orleans Case No. 401-182, which was later reported on appeal as *State v. Fleming*, 846 So.2d 114 (La. App. 4th Cir. 2003).[74] Jones also addresses this case in his federal petition.

Jones appears to reference the statistics introduced into evidence in the *Trainor/Fleming* case, in which the co-defendants apparently challenged their 1998 indictments on the basis that race discrimination in the selection of grand jury forepersons in Orleans Parish violated their equal protection and due process rights under the United States Constitution. The Louisiana Fourth Circuit in *State v. Fleming*, while acknowledging the potential for discriminatory abuse inherent in Article 413(C), pre-2001 amendment, ruled that the statistical evidence presented to the trial court, which is relied on by Jones, concerning the race and gender makeup of the grand juries and jury forepersons from 1987 to 2000 <u>failed</u> to establish a *prima facie* case of discrimination because the data was incomplete. *Id.*, 846 So.2d at 122.

Jones's reference to and reliance on the statistics addressed in *State v. Fleming* suffers from the same incompleteness, which:

> make[s] it impossible to determine the disparity between the African-Americans [sic] and female forepersons as compared to the African-Americans and females in the

---

[73]The United States Supreme Court ruled long ago that exclusion of women from a federal grand jury panel was unconstitutional. *Ballard v. United States*, 329 U.S. 187, 195-96 (1946); *see also J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127 (1994) (gender-based peremptory challenges to petit jurors violate the Constitution).

[74]*See* Rec. Doc. No. 1-7, Exhibits to Complaint.

voter registration population.  Moreover, as the State argues, it is quite possible that "the missing data could prove no disparity at all in the race and gender of the forepersons."  It is important to note that this is not a case in which there were no African-American or female forepersons on the grand jury during the relevant period.  Rather, the record reflects (as shown in Defendants' chart from which the statistical data was derived) that the known statistical data showed there were ten African-American and eleven female forepersons over the thirteen-year period.

*Id.*, 846 So.2d at 122.

Because Jones has not established discrimination, the record does not prove that the grand jury was unconstitutionally impaneled or that the indictment was defective.  Accordingly, Jones's claim that the grand jury indictment was unconstitutionally defective and left the state court without subject matter jurisdiction lacks merit.  The state courts' denial of relief on this claim was not contrary to, or an unreasonable application of, Supreme Court precedent.

## XII. <u>Ineffective Assistance of Counsel</u>

Jones raises nine grounds on which he alleges that his counsel gave ineffective assistance.  His claim regarding appellate counsel was raised on direct appeal, and denied by the state courts as meritless.  He raised each of the remaining arguments in his application for post-conviction relief, which was denied by the state courts' without written reasons.

The issue of ineffective assistance of counsel is a mixed question of law and fact.  *Motley v. Collins*, 18 F.3d 1223, 1226 (5th Cir. 1994).  Thus, the question before this court is whether the state courts' denial of relief was contrary to, or an unreasonable application of, United States Supreme Court precedent.

The standard for judging the performance of counsel was established by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984).  In *Strickland*, the Court established a two-part test for evaluating claims of ineffective assistance of counsel in which the

petitioner must prove deficient performance and prejudice therefrom. *See Strickland*, 466 U.S. at 697. To meet the burden of proving ineffective assistance of counsel, petitioner "must demonstrate, by a preponderance of the evidence, that his counsel was ineffective." *Jernigan*, 980 F.2d at 296; *see also Clark v. Johnson*, 227 F.3d 273, 284 (5th Cir. 2000), *cert. denied*, 531 U.S. 1167 (2001).

To prevail on the deficiency prong, petitioner must demonstrate that counsel's conduct failed to meet the constitutional minimum guaranteed by the Sixth Amendment. *See Styron v. Johnson*, 262 F.3d 438, 450 (5th Cir. 2001), *cert. denied*, 534 U.S. 1163 (2002). "The defendant must show that counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 687-88; *Little v. Johnson*, 162 F.3d 855, 860 (5th Cir. 1998). Analysis of counsel's performance must take into account the reasonableness of counsel's actions in light of all of the circumstances. *See Strickland*, 466 U.S. at 689. "[I]t is necessary to 'judge . . . counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.'" *Lockhart v. Fretwell*, 506 U.S. 364, 371 (1993) (quoting *Strickland*, 466 U.S. at 690). Petitioner must overcome a strong presumption that the conduct of his counsel falls within a wide range of reasonable representation. *See Crockett v. McCotter*, 796 F.2d 787, 791 (5th Cir. 1986); *Mattheson v. King*, 751 F.2d 1432, 1441 (5th Cir. 1985).

In order to prove prejudice, petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694; *United States v. Kimler*, 167 F.3d 889, 893 (5th Cir. 1999). Furthermore, "[t]o meet the prejudice prong, the [petitioner] must affirmatively prove, and not merely allege, prejudice." *DeVille v. Whitley*, 21 F.3d 654, 659 (5th Cir. 1994); *Theriot v. Whitley*, 18 F.3d 311, 314-15 (5th Cir. 1994). In this context, a reasonable probability of prejudice is "a

probability sufficient to undermine confidence in the outcome." *Id*. In making a determination as to whether prejudice occurred, courts must review the record to determine "the relative role that the alleged trial errors played in the total context of [the] trial." *Crockett*, 796 F.2d at 793. A habeas corpus petitioner "need not show that 'counsel's deficient conduct more likely than not altered the outcome in the case.' But it is not enough, under Strickland, 'that the errors had some conceivable effect on the outcome of the proceeding.'" *Motley v. Collins*, 18 F.3d 1223, 1226 (5th Cir. 1994) (quoting *Strickland*, 466 U.S. at 693). Thus, conclusory allegations of ineffective assistance of counsel, with no showing of effect on the proceedings, do not raise a constitutional issue sufficient to support federal habeas relief. *Miller v. Johnson*, 200 F.3d 274, 282 (5th Cir.) (citing *Ross v. Estelle*, 694 F.2d 1008, 1012 (5th Cir. 1983)), *cert. denied*, 531 U.S. 849 (2000).

In deciding ineffective assistance claims, a court need not address both prongs of the conjunctive *Strickland* standard, but may dispose of such a claim based solely on a petitioner's failure to meet either prong of the test. *Kimler*, 167 F.3d at 893. On habeas review, scrutiny of counsel's performance "must be highly deferential" and the court will "indulge a strong presumption that strategic or tactical decisions made after an adequate investigation fall within the wide range of objectively reasonable professional assistance." *Moore v. Johnson*, 194 F.3d 586, 591 (5th Cir. 1999) (citing *Strickland*, 466 U.S. at 689-90); *Mattheson*, 751 F.2d at 1441.

### A. Inconsistent Testimony at Trial for Appeal (Claim No. 4)

Jones's first claim is addressed to counsel on appeal. He argues that under *United States v. Cronic*, 466 U.S. 648 (1984), he was denied effective counsel because appointed counsel only raised excessive sentence. He argues that, because the sentence was mandatory and not discretionary, her failure to raise other claims denied him effective counsel. The Louisiana Fourth Circuit denied this

claim as meritless finding that Jones's failed to meet the standards of *Strickland*. This was the last reasoned opinion on this issue. *See Ylst*.

In *Cronic*, relied on here by Jones, the Supreme Court recognized that the performance of counsel may be so inadequate as to constitute no assistance of counsel at all, despite the physical presence of an attorney at the proceeding. *Cronic*, 466 U.S. at 654 n. 11. The *Cronic* presumption of prejudice arises in circumstances where: (1) there exists a "complete denial of counsel" or a denial of counsel "at a critical stage" of the defendant's trial; (2) defense counsel fails to "subject the prosecution's case to meaningful adversarial testing"; or (3) counsel "is called upon to render assistance where competent counsel very likely could not." *Cronic*, 466 U.S. at 658-59 (internal citations omitted). It is in the presence of these "circumstances of magnitude" where "the likelihood that the verdict is unreliable is so high that a case-by-case inquiry is unnecessary." *Mickens v. Taylor*, 535 U.S. 162, 166 (2002).

The Supreme Court also has emphasized that for *Cronic* to apply, "the attorney's failure must be complete." *Bell v. Cone*, 535 U.S. 685, 697 (2002). "For purposes of distinguishing between the rule of *Strickland* and that of *Cronic*," the Supreme Court held that a case does not come under *Cronic* merely because counsel failed to "oppose the prosecution . . . at specific points" in the proceeding. *Bell*, 535 U.S. at 697. The distinction between counsel's failure to oppose the prosecution entirely and counsel's failure to do so at certain points is a "difference . . . not of degree but of kind." *Bell*, 535 U.S. at 697. With respect to appellate counsel, the Supreme Court requires that counsel utilize a process that will "afford adequate and effective appellate review to indigent defendants" and that it "reasonably ensure that an indigent's appeal be resolved in a way that related to the merit of that appeal." *Smith v. Robbins*, 528 U.S. 259, 276-77 (2000).

In the instant case, Jones's appointed appellate counsel filed a brief raising one issue, that the sentence was unconstitutionally excessive.[75] The record also reflects that, after counsel filed the brief, Jones was granted leave and did file his own brief raising six grounds for relief.[76] As discussed earlier in this Report, two of the claims were procedurally defaulted and the remainder were dismissed as meritless, including the one raise by counsel.

Thus, in light of *Cronic* and *Smith*, there is no basis for a finding that Jones was actually or constructively denied counsel on appeal. His counsel did act in filing a brief requesting review of the merits of an excessive sentence claim. He has not identified any other meritorious claim that should have been presented for review. The claims he raised himself were also dismissed, thus suggesting that the record contained no meritorious claims for counsel to have raised.

With regard to any claim that may have been facially valid on the record, under Louisiana law, an errors patent review would automatically be conducted by the appellate court. La. Code Crim. P. art. 920(2). In fact, Jones's counsel requested that an errors patent review be conducted. In spite of this, there was no requirement that appellate counsel make this request or that her performance was deficient for failing to point out every possible error which may have been addressed as an error patent on the face of the record. The Court notes that the Louisiana Fourth Circuit found no such errors either.[77]

Jones has not established that counsel's performance was deficient or prejudicial to him under *Strickland* or *Cronic*. The Court therefore finds that this claim is without merit.

---

[75]St. Rec. Vol. 2 of 4, Appeal Brief, 99-KA-1123, 1/18/00.

[76]*Id*., Supplemental Appeal Brief, 99-KA-1123, 4/17/00.

[77]St. Rec. Vol. 2 of 4, 4th Cir. Opinion, 99-KA-1123, p. 5, 9/20/00.

**B.**      <u>Failure to Request Severance or Object to Joint Trial (Claim Nos. 5 and 15)</u>

Jones alleges that his trial counsel was ineffective for failure to request a severance of the trial and for failure to object to the joint trial. He claims that a severance was warranted in light of the prejudicial inculpatory statements made by his brother, Gary Jones. He claims that counsel did not move for a severance pretrial nor did she later object to the joint trial during trial. Jones claims that he told his counsel before trial that he signed the waiver of rights form but refused to make a statement to the police. Having to proceed to trial with his brother's statement prejudiced his ability to refute the statement attributed to him and denied him the ability to challenge the allegation that he also shot at the victim. He also claims that the admission denied him the right to confront and cross-examine his brother as a co-defendant. As a result, counsel was ineffective for failing to request the severance.

To assess counsel's performance, the Court will consider the parameters under which the trials could have been severed. Pursuant to La. Code Crim. P. art. 704, jointly indicted defendants shall be tried jointly, unless the State elects to try them separately or on motion of a defendant and after a contradictory hearing the trial court satisfies itself that justice requires severance. To establish that justice requires a severance in Louisiana, a defendant must show by convincing evidence that his defense will be antagonistic to the defense offered by the other defendant. *State v. Vale*, 650 So.2d 379, 385 (La. App. 5th Cir. 1995), *aff'd in part*, *rev'd in part on other grounds*, 666 So.2d 1070 (La. 1996).

In *State v. McGraw*, 366 So.2d 1278 (La. 1978), the Louisiana Supreme Court recognized that persons jointly indicted are not entitled to a severance of trial as a matter of right and that the trial court's ruling lies within the discretion of the trial judge. *Id*., at 1283. The *McGraw* court went

on to explain that the mere allegation of antagonistic defenses is insufficient and a defendant must show that actual prejudice will result from a joint trial. The actual prejudice standard requires a showing that the defendant would probably not have been convicted had he been accorded a separate trial.

Furthermore, under Louisiana law, justice does not require severance where only the extent of participation of each defendant is at issue. *State v. Gaskin*, 412 So.2d 1007 (La. 1982); *State v. Simmons*, 381 So.2d 803 (La. 1980), *cert. denied*, 449 U.S. 1036 (1980). When both defendant's statements show that both defendants participated as principals to the offense, no severance is required. *Id.*; *State v. Williams*, 416 So.2d 914 (La. 1982).

Considering federal law, the United States Supreme Court has held that severance should be granted "only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro v. United States*, 506 U.S. 534, 539 (1993). Thus, under federal law, "[t]he test for antagonistic defenses requires that the defenses be irreconcilable or mutually exclusive: the jury, in order to believe one defendant's defense must necessarily disbelieve the antagonistic defense of another defendant." *United States v. Rocha*, 916 F.2d 219, 231 (5th Cir. 1990), *cert denied*, 500 U.S. 934 (1991) (citing *United States v. Hernandez*, 842 F.2d 82, 86 (5th Cir. 1988)); *McGraw v. Lynn*, 990 F.2d 625, No. 92-3505, 1993 WL 117782 (5th Cir. Mar. 23, 1993). Thus, antagonistic defenses justify severance only when the defenses are "antagonistic to the point of being mutually exclusive or irreconcilable, so that the jury, in order to believe the core of one defense, must necessarily disbelieve the core of the other." *United States v. Sandoval*, 847 F.2d 179, 183 (5th Cir.

1988) (citation omitted); *Zafiro*, 506 U.S. at 539-40 (mutually antagonistic defenses are not prejudicial per se and question of severance is left to sound discretion of district court).

In this case, Jones argues that the joint trial affected his ability to challenge his brother's inculpatory statement in which he indicated that he also shot at the victim. The testimony at trial reflects that Gary Jones was the shooter in the incident in the courtyard of the Lafitte Housing Project.[78] In fact, Banks testified that she did not see Terry do anything at that time. Later, just prior to the shooting, Terry and Gary were seen walking down the street each carrying a gun.[79] She testified that she saw the two men push Andrews off of his bike, and she saw Gary shoot him.[80] After the first shot, she hid behind the bushes.[81] She heard a total of two shots.[82] Jones's counsel asked her: "And you never did see Terry shoot a gun on this particular night did you?"[83] Banks answered simply, "No."

As was clearly shown from this exchange, the evidence before the jury indicated that Terry Jones was not seen shooting a gun, or more importantly not seen shooting at the victim. The only issue is the extent of the involvement of the two co-defendants as principals in the murder. In addition, as Jones concedes, both also made inculpatory statements. It was a matter within the juries province to consider the credibility of Gary's statement, alleging that Terry also shot at

---

[78]St. Rec. Vol. 2 of 4, Trial Transcript, p. 198 (Banks), 4/22/98.

[79]*Id.*, at p. 202.

[80]*Id.*, at p. 203, 205.

[81]*Id.*, at p. 203-04, 206.

[82]*Id.*, at p. 205.

[83]*Id.*, at p. 213.

Andrews, compared to Banks's testimony that she did not see Terry shoot a gun that night. This cannot form the basis for a severance under the legal standards set forth above.

Jones has made no showing of an antagonistic defense which would have entitled him to a severance. The record does not support that an antagonistic defense existed before trial or that one was posited to the jury. He has not shown a serious risk that his joint trial compromised his right to a fair trial and he cannot establish a due process violation resulting from the denial of his motion to sever. *See Zafiro*, 506 U.S. at 539.

Having failed to establish that a severance was called for in this case, he has not demonstrated that counsel's failure to obtain a severance was deficient performance or that he was prejudiced by the joint trial. The state courts' denial of relief on this issue was not contrary to or an unreasonable application of Supreme Court law. Jones is not entitled to relief on this claim.

### C.     Failure to Impeach and/or Cross-Examine Brenda Banks (Claim No. 6(b))

Jones alleges that his counsel should have questioned Banks at trial about her inconsistent statement given to police regarding who she saw shooting in the incident in the courtyard of the projects earlier on the evening of the murder. As resolved previously in this Report in the section addressing the *Brady/Kyles* claim, assuming that Banks made a pretrial statement to detectives, Jones misconstrues the statement he attributes to Banks. Jones misconstrues the quoted portion appearing in his brief to be that Banks denied seeing the exchange of gunfire in the courtyard. To the contrary, the statement quoted reflects that Banks said that she saw the exchange. It was later that she was told the names of the men she saw involved in that exchange of gunfire with Andrews.

This is the same as her testimony at trial. She testified at trial that she saw the gunfire in the square, specifically that she saw Gary shooting at Andrews, but did not learn the names of the men

she saw, the Jones brothers, until after that incident.[84]  From this, there is no basis shown for counsel to have pursued a line of questioning on cross-examination related to the alleged pretrial statement.

A review of the cross-examination at trial conducted by Jones's counsel reflects that she asked pertinent questions challenging Banks's identification and her inability to distinguish between Terry and Kerry.  She also made clear with one question that Banks did not see Terry Jones shoot a gun that night.[85]  The transcript reflects that counsel's performance was not unconstitutionally deficient.  Her questions were relevant and incisive.  Jones has failed to overcome the presumption that counsel's actions were within the wide range of reasonable professional assistance and sound trial strategy.  *Strickland*, 466 U.S. at 689.

The state courts' denial of relief on this claim was neither contrary to nor an unreasonable application of Supreme Court precedent.  Jones is not entitled to relief on this claim.

## D.    Failure to Impeach Bruce Nelson (Claim No. 7)

Jones alleges that his counsel did not make all efforts to impeach Bruce Nelson at trial.  Jones alleges that the police report prepared by Officer Kevin Thomas indicated that Nelson told him that a man named Terry, one of the two men involved in the gunfight in the courtyard, was in a wheelchair.  He requested that counsel ask Nelson about this at trial.  He concedes that counsel in fact questioned Nelson about the wheelchair reference and Nelson denied that he ever said it.  He argues that counsel should have called the reporting officer to the stand to challenge Nelson's testimony.

---

[84]*See* St. Rec. Vol. 2 of 4, Trial Transcript, pp. 196-198, 213, 4/22/98.

[85]*Id.*, at pp. 210-13.

Officer Thomas testified at trial that he took a statement from the victim's brother, Bruce Nelson, shortly after the shooting.[86]  Nelson provided him with the names of two persons who he believed could have shot his brother.[87]  He prepared the initial police report.[88]

Bruce Nelson testified that he knew who the Jones brothers were before the night his brother was killed, but they were not friends.[89]  Nelson saw Terry and Gary Jones fighting with and jumping on his brother, Andrews, in the courtyard around 9:30 p.m.[90]  He did not see any one of them with a gun.[91]  After the fight, they all just walked off.[92]

About fifteen minutes later, he saw Terry and Gary walking through the projects carrying guns.[93]  Terry had a gun tucked into his pants outside of his shirt.[94]  Gary was holding two guns, and he was running towards Andrews.  When the two men got close, they fired their guns at Andrews.[95]  About an hour later, Nelson saw Andrews sitting in front of a nearby store.[96]  About ten minutes

---

[86]St. Rec. Vol. 2 of 4, Trial Transcript, p. 63, 4/21/98.

[87]*Id.*, at p. 65.

[88]*Id.*, at pp. 65-66.

[89]St. Rec. Vol. 2 of 4, Trial Transcript, p. 164, 4/22/98.

[90]*Id.*, at pp. 167-68, 180-81.

[91]*Id.*, at p. 168.

[92]*Id.*, at p. 169.

[93]*Id.*, at p. 169.

[94]*Id.*, at p. 170.

[95]*Id.*, at p. 171.

[96]*Id.*, at p. 173.

later, he became concerned that Andrews was alone, so he went back to check on him. On his way, he found Andrews on the ground.[97]

Upon questioning by Terry Jones's counsel, Nelson indicated that he actually arrived as the earlier fight in the courtyard was ending, and the Joneses and Andrews were walking off.[98] He also conceded that he really could not tell Terry apart from his twin, but "their girlfriend" told him that they had done it.[99] He also acknowledged that he did give a statement to the police on the night of the murder.[100] He denied ever telling the police that Terry was in a wheelchair at the time of the courtyard fight.[101]

In her closing arguments, counsel focused the jury's attention on the inability of the witnesses, Banks and Nelson, to tell the twins apart. She also reiterated, over the objection of the State, that Nelson told police that the man he called Terry was in a wheelchair.[102]

Counsel adequately utilized the discrepancy in the police report and Nelson's testimony to emphasize the identity problem. As the State points out, the report said what it said and it was identified by Officer Thomas at trial. Counsel was actually better able to impugn Nelson's testimony using the wheelchair reference then she would have been if she had called Officer Thomas back to explain or challenge the report. Counsel properly left it up to the jury to determine if the report was accurate and Nelson was lying.

---

[97]*Id.*, at p. 174.

[98]*Id.*, at p. 179-80.

[99]*Id.*, at p. 181.

[100]*Id.*, at pp. 184-85.

[101]*Id.*, at pp. 185-86, 188.

[102]*Id.*, at p. 246.

Nevertheless, Jones has not established that counsel's strategic approach to the wheelchair reference fell outside of the wide range of competent trial strategy. He has not shown that counsel's actions were in any way prejudicial. He therefore has not established that the state courts' denial of relief was contrary to, or an unreasonable application of, *Strickland*. He is not entitled to relief on this claim.

### E. Failure to Object to the Reasonable Doubt Charge (Claim No. 8(b))

Jones next alleges that his counsel was ineffective for failure to object to the reasonable doubt charge given by the Trial Court. For the reasons set forth previously in this opinion, Jones has failed to allege that the reasonable doubt charge given in his case was unconstitutional. For this reason, there was no basis for counsel to enter an objection. Counsel's failure to make a frivolous or baseless objection is not deficient performance below an objective level of reasonableness. *Green v. Johnson*, 160 F.3d 1029, 1037 (5th Cir. 1998).

Jones has not shown that the denial of relief on this claim was contrary to, or an unreasonable application of, *Strickland*. He is not entitled to relief on this claim.

### F. Failure to Pursue Medical Records on Brenda Banks (Claim No. 9)

Jones argues that his counsel should have pursued obtaining copies of medical records related to Brenda Banks. He claims that the records could have established that Banks had a drug problem which could have been used to challenge her credibility.

The record reflects that counsel for Gary Jones filed motions for issuance of subpoenas to obtain medical records related to Brenda Banks.[103] At the hearing held before the Trial Court on

---

[103]St. Rec. Vol. 4 of 4, Motion and Order for Subpoena Duces Tecum, 3/4/98; Motion and Order for Subpoena Duces Tecum #2, 3/4/98; Motion and Order for Subpoena Duces Tecum #3, 3/4/98; Motion and Order for Subpoena Duces Tecum #4, 3/4/98.

April 17, 1998, counsel argued that Banks had missed several pretrial matters before the court, and the reason given by the State was that she was in Charity Hospital.[104]  Counsel suggested that it may have been drug related and the medical records were relevant.  Terry Jones's counsel joined in the motion.[105]  The Trial Court granted the motion and ordered the records returnable prior to trial.

While it is true that the trial record does not contain any indication that the records were received by counsel, a review of the transcript shows that none of the defense attorneys for either defendant raised issues with the medical records at trial.  Prior to the start of trial, the Court addressed certain pretrial matters, including motions in limine.[106]  Defense counsel for both defendants informed the Court that there were no other matters to be resolved after resolution of the motion to suppress the identification.[107]

Although Jones suggests that he questioned counsel about the medical records, he has not demonstrated that Banks had a drug problem or that she was under the influence of drugs when she witnessed the incidents leading up to and including the murder.  During trial, Banks testified that she was not under influence of drugs or alcohol at the time of the shooting or on the day of trial.[108]  Jones now presents only conjecture, just as he did to the state courts, that this was not true.  His argument, however, is not enough to establish a deficiency in counsel's performance or to doubt her decision not pursue the medical records further, assuming they were not received and reviewed.  Such a decision would have fallen within counsel's discretion and trial strategy.

---

[104]St. Rec. Vol. 4 of 4, Hearing Transcript, 4/17/98.

[105]*Id.*, at p.5.

[106]St. Rec. Vol. 2 of 4, Trial Transcript, pp. 3-13, 4/21/98.

[107]*Id.*, at pp. 3, 13, 26-27.

[108]St. Rec. Vol. 2 of 4, Trial Transcript, p. 222, 4/22/98.

Jones has not shown that the denial of relief on this claim was contrary to, or an unreasonable application of, *Strickland*. He is not entitled to relief on this claim.

### G.  Failure to Argue that Photographic Line-up Was Suggestive (Claim No. 10(b))

Jones contends that counsel was deficient in failing to challenge the photographic line-up on the basis that the process was suggestive. As thoroughly discussed previously in this report, counsel vigorously and consistently challenged the suggestive nature of the photographic line-up. As noted above, counsel was involved in all three hearings on the suppression motion. The line-up at which Banks selected Jones and his twin were the targets of the questioning, from the lighting to the suggestion that Lois Nelson, and even Detective Young, may have encouraged her to select the Jones's brothers. For the reasons set forth previously in this opinion, Jones has failed to establish that the photographic line-up was suggestive or unconstitutional in any manner. The record, instead, demonstrates that counsel did in fact challenge the identification and the identification process in a sound and professional manner.

Jones has not shown that the denial of relief on this claim was contrary to, or an unreasonable application of, *Strickland*. He is not entitled to relief on this claim.

### H.  Failure to Object to Impermissible Demonstrative Evidence (Claim No. 11)

Jones alleges that counsel was ineffective for failure to object to the admissibility of the gun presented at trial. He claims that the gun was never linked to Gary Jones and was allowed in only as demonstrative evidence, because the defendants' statements indicated that they at least used guns similar to the one seized at the time of Gary Jones's arrest.

Inconsistent with the title of this claim, Jones recognizes that his counsel did in fact challenge the admissibility of the weapon at trial. A clear reading of Jones's claim demonstrates that

he is actually complaining about the Trial Court's decision to allow the State to use the gun. Nevertheless, the record demonstrates that there was an objection to the admission of the weapon at trial.

Sergeant Kenneth Faust testified at trial that he recovered a loaded, black Lorcin[109] .38 caliber handgun from the car in which Gary Jones was located when he was arrested.[110] Jones was exiting the passenger side of the vehicle when the officer arrived.[111] Sergeant Faust conceded that he did not know who actually owned the gun when it was seized, but no one else was in the car.[112] Jones's counsel made clear through her questioning that Terry Jones was not involved in this arrest.[113]

During the testimony, but outside of the hearing of the jury, Gary Jones's counsel objected to the admissibility of the gun.[114] The objection was based on the fact that there was no connection made by the State between the gun and this crime. Also, counsel argued that it was unduly prejudicial. The Trial Court overruled the objection finding the gun to be probative. Because the motion was made to exclude the weapon, and that motion was denied, there was no need for Terry Jones's counsel to enter a duplicitous motion. *Accord*, *Green*, 160 F.3d at 1037. Counsel's performance was not deficient or prejudicial in this regard.

---

[109]The transcript improperly spells this "Lorison" and "Lorson." *Id.*

[110]St. Rec. Vol. 2 of 4, Trial Transcript, p. 148, 4/21/98.

[111]*Id.*, at p. 149.

[112]*Id.*, at pp. 149-50.

[113]*Id.*, at p. 150.

[114]*Id.*, at pp. 156.

Jones has not shown that the denial of relief on this claim was contrary to, or an unreasonable application of, *Strickland*. He is not entitled to relief on this claim.

**I.**     **Failure to Call Witnesses and Conduct Pretrial Investigation (Claim No. 12)**

In his claims, Jones appears to argue that counsel's pretrial investigation of the case was lacking, because none of the appointed attorneys questioned the paramedics who arrived at the scene about whether Bruce Nelson's friend was present and performing CPR on Andrews. They also did not question or locate the friend. Jones seems to opine that Nelson's friend, or perhaps Nelson himself, may have moved any gun that would have been in Andrews possession at the time of the murder.

It can hardly be said that counsel for Jones did no pretrial investigation. This record is replete with pretrial motions challenging the evidence and statements, and seeking disclosure of information only an informed attorney would seek. The detailed questioning of witnesses at trial and in the preceding hearings reflects that counsel was well-prepared and well-informed.

Furthermore, it is well settled that "'[c]omplaints of uncalled witnesses are not favored, because the presentation of testimonial evidence is a matter of trial strategy and because allegations of what a witness would have testified are largely speculative.'" *Graves v. Cockrell*, 351 F.3d 143, 156 (5th Cir. 2003) (quoting *Buckelew v. United States*, 575 F.2d 515, 521 (5th Cir. 1978)). Jones has not submitted to this court or the state courts any evidence or support for what, if any, relevant information the paramedics, or Nelson's friend, might state if brought to trial. Instead, what Jones would have this Court do, is reflect in hindsight that maybe the uncalled witnesses, from whom he has no affidavit, saw someone giving the victim CPR. From this, he extrapolates that somehow this would raise an inference that someone could have taken a gun off of Andrews's body. That is not

a task within the scope of a habeas review, especially in light of the overwhelming testimony from the State's witnesses that no one saw Andrews with a gun at any time that night.

Jones has failed to demonstrate a deficiency in counsel's performance. The state courts' denial of relief was not contrary to or an unreasonable application of *Strickland*. He is not entitled to relief on this claim.

**J.      Failure to File Motion to Quash Indictment (Claim No. 14(b))**

Finally, Jones argues that counsel was deficient in failing to file a motion to quash the indictment based on his argument that La. Code Crim. P. art. 413(C) was unconstitutional which caused the indictment to be issued by an improperly empaneled grand jury. The record indicates, however, that at the time of Jones's prosecution, counsel's failure to file a motion to quash the indictment was reasonable and not unconstitutionally deficient.

Under Louisiana law, a motion to quash a grand jury indictment may be filed if, among other things, "the manner of selection of . . . the grand jury venire, or the grand jury was illegal." La. Code Crim. P. art. 533.[115] However, federal courts have long recognized that the filing of a motion to quash of this type is generally a matter of professional judgment left to the discretion of counsel. *Williams v. Beto*, 354 F.2d 698, 703 (5th Cir. 1965) (citing *Michel v. Louisiana*, 350 U.S. 91 (1955); *United States v. Lewis*, 786 F.2d 1278, 1283 n.4 (5th Cir. 1986).

---

[115]La. Code Crim. P. art. 533 provides:
A motion to quash an indictment by a grand jury may also be based on one or more of the following grounds:
(1)      The manner of selection of the general venire, the grand jury venire, or the grand jury was illegal.
(2)      An individual grand juror was not qualified under Article 401.
(3)      A person, other than a grand juror, was present while the grand jurors were deliberating or voting, or an unauthorized person was present when the grand jury was examining a witness.
(4)      Less than nine grand jurors were present when the indictment was found.
(5)      The indictment was not indorsed "a true bill," or the endorsement was not signed by the foreman of the grand jury.

In *Michel*, the Supreme Court held that the failure of counsel to move to quash the indictment on grounds that the grand jury was unconstitutionally impaneled because of the historical exclusion of African-Americans from the grand jury, including such exclusions in the consolidated cases then before the Court, was not deficient performance per se and was within the range of sound trial strategy, given the facts of the case. *Michel*, 350 U.S. at 100. In this case, Jones has not demonstrated that his counsel was outside of this standard in failing to object to the indictment or the court's jurisdiction based on the grand jury selection process.

Even if deficient performance could somehow be found, Jones cannot demonstrate prejudice arising from counsel's actions. *See Pickney v. Cain*, 337 F.3d 542, 545 (5th Cir. 2003) (addressing prejudice in terms of ineffective assistance of counsel to avoid a procedural default). As discussed above, Jones has made no showing to this, or any other court, of an intentional race or gender discrimination in the selection of his grand jury or its foreperson. Without such a showing, he has not stated a Constitutional violation from which he has suffered any prejudice. *Guillory v. Cain*, 303 F.3d 647, 653 (5th Cir. 2001). Furthermore, in light of the strong evidence against Jones, even if counsel had filed a successful motion to quash the indictment, the State would have undoubtedly sought and obtained a second indictment, and there is no showing that the result would have been any different. *Brown v. Cain*, 337 F.3d 546, 550 n. 5 (5th Cir. 2003), *cert. denied*, 540 U.S. 117 (2004); *Pickney*, 337 F.3d at 545 ("[W]e have no doubt that, if [petitioner] had been successful in having his indictment quashed, the State of Louisiana would have sought and obtained a second indictment"); *Merridith v. Cain*, No. 04-1227, 2006 WL 2054446 at *8 (W.D. La. June 29, 2006) (Report and Recommendation adopted by District Judge).

Jones has not shown defective performance by counsel or any prejudice resulting from a failure to file a motion to quash or object to the state trial court's jurisdiction. For these reasons, the state courts' denial of relief on this claim was not contrary to, or an unreasonable application of, *Strickland*. He is not entitled to relief on this claim.

## XIII.  Recommendation

For the foregoing reasons, it is **RECOMMENDED** that Terry Jones's petition for issuance of a writ of habeas corpus filed pursuant to 28 U.S.C. § 2254 be **DENIED** and **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation **within fourteen (14) days** after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. *Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1430 (5th Cir. 1996).[116]

New Orleans, Louisiana, this 9th day of September, 2010.

_____
**KAREN WELLS ROBY**
**UNITED STATES MAGISTRATE JUDGE**

---

[116]*Douglass* referenced the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend the period to fourteen days.